*Decision will be entered under Rule 50.*

AMERICAN ENKA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60686.   Filed June 24, 1958.

*H. Gilmer Wells, Esq.,* and *Albert C. Petite, Esq.,* for the petitioner.[1]
*Martin D. Cohen, Esq.,* for the respondent.

This proceeding involves deficiencies in income and excess profits tax for the calendar years 1950 and 1951 in the respective amounts of $358,446.35 and $300,641.42.   The issues for decision are:

1. Whether petitioner, in determining its equity capital within the meaning of section 437 of the Internal Revenue Code of 1939, is entitled to accrue as assets as of the beginnings of the taxable years 1950 and 1951, respectively, the amounts of overassessments plus interest attributable to section 722 excess profits tax relief for the years 1941–1945.

2. Whether interest on the above-mentioned overassessments is accruable in toto for income tax purposes in the year 1951.

3. Whether petitioner's 1950 excess profits tax liability constitutes an accrued liability as of the beginning of the taxable year 1951, for the purposes of determining petitioner's equity invested capital under section 437 for the year 1951.

4. If the interest on the overassessments attributable to section 722 excess profits tax relief for the years 1941–1945 is accruable in toto for income tax purposes in the year 1951 (see Issue No. 2), then, does such interest constitute "abnormal income" for that year within the meaning of section 456 of the Internal Revenue Code of 1939?

[1] By permission of the Court, Sears, Roebuck and Co. filed a brief as *amicus curiae.*

OPINION.

FORRESTER, *Judge:* The facts have been wholly stipulated and such stipulations are incorporated herein and adopted as our findings of fact. The facts necessary to an understanding of the issues posed are noted respectively therewith.

## *Issue 1.*

This corporate petitioner filed its Federal income tax returns for the taxable years 1950 and 1951 with the then collector of internal revenue for the district of North Carolina, reported its income on the calendar year basis and kept its books in accordance with an accrual method of accounting.

Between the months of September 1943 and November 1945 petitioner filed applications for relief from Federal excess profits taxes for the taxable years 1940–1945. These applications were filed under the provisions of section 722 of the Internal Revenue Code of 1939 and were processed by the Section 722 Field Committee of the Internal Revenue Service, Greensboro, North Carolina.

On January 27, 1949, after negotiations with the Section 722 Field Committee and at its request, petitioner executed Treasury Department Form EPC–1, thereby indicating its consent to the constructive average base period net incomes (hereinafter referred to as CABPNI's) proposed by the said committee for the years 1940–1945. The years and amounts were as follows:

| Year | CABPNI |
| --- | --- |
| 1940 | $2,562,160.80 |
| 1941 | 3,239,017.06 |
| 1942 | 3,254,508.94 |
| 1943 | 3,254,508.94 |
| 1944 | 3,254,508.94 |
| 1945 | 3,254,508.94 |

The CABPNI's thus agreed to by petitioner were greater than the average base period net incomes used in the preparation of its excess profits tax returns for the years 1940–1945, but less than the constructive average base period net incomes claimed in its applications for section 722 relief in respect of such years.

In a letter dated February 7, 1949, the internal revenue agent in charge, Greensboro, North Carolina, advised petitioner that, in accordance with the established Internal Revenue Service procedure, the findings and recommendations of the Section 722 Field Committee were being certified to the Excess Profits Tax Council in Washington, D. C., for review and approval. Thereafter, by letter dated July 28, 1949, the Chairman of the Excess Profits Tax Council advised petitioner that the Executive Committee of the Excess Profits Tax Council had approved the amounts of its constructive average base period

net incomes for the years 1940–1945, inclusive, as recommended by the Section 722 Field Committee in the office of the internal revenue agent in charge at Greensboro, North Carolina, and as agreed to by petitioner on Treasury Department Form EPC–1.

The net overassessments attributable to petitioner's section 722 relief claims after reduction by deficiencies in income taxes for the years 1940–1945, as determinable from the indicated revenue agent's reports, were as follows:

| Year | Date of R. A. R. | Net overassessment attributable to section 722 |
|---|---|---|
| 1940 | Oct. 25, 1949 | $116,803.64 |
| 1941 | Nov. 29, 1949 | 172,206.39 |
| 1942 | Nov. 29, 1949 | 119,633.21 |
| 1943 | Dec. 7, 1949 | 239,268.88 |
| 1944 | Dec. 7, 1949 | 132,765.03 |
| 1945 | Dec. 7, 1949 | (Additional credit carryback to 1943 of $291,791.32). |

On October 25, 1949, petitioner executed Treasury Department Form 873 agreeing to the overassessment for 1940. Thereafter, by a letter dated December 21, 1949, from the internal revenue agent in charge, Greensboro, North Carolina, petitioner was advised of the scheduling of an overassessment in the amount of $116,803.64 in its Federal excess profits tax liability for the year 1940.

The revenue agent's reports of November 29, 1949, and December 7, 1949, appearing above, were protested by petitioner on February 8, 1950, with respect to (1) the proposed disallowance of an $8,300 deduction in connection with petitioner's retirement plan for each of the years 1941 through 1945, and (2) the proposed disallowance of relief under section 721 of the 1939 Code for the years 1941 and 1944.

Conferences dealing with the protested non-section 722 issues were held on May 16, 1950, and May 25, 1950. As a result of these conferences a field conferee of the office of the internal revenue agent in charge, Greensboro, North Carolina, allowed petitioner's contention under section 721 for the years 1941 and 1944. Thereafter, on June 29, 1950, petitioner executed Treasury Department Form 874, reflecting revised tax liabilities for 1941, 1943, 1944, and 1945. On July 10, 1950, a similar agreement was executed by petitioner with respect to 1942.

On July 19, 1950, the case was referred to the national office of the Internal Revenue Service in Washington, D. C., for appropriate reviewing action. Because the recommended overassessments exceeded $200,000 in amount the case file was referred to the Office of the Chief Counsel for review and preparation of a report to the Joint Committee on Internal Revenue Taxation.

The Office of the Chief Counsel disagreed with the exclusion of certain alleged abnormal income from petitioner's 1941 and 1944 excess profits income pursuant to section 721 of the 1939 Code. Ad-

ditional conferences were held with petitioner's representatives in 1951 but no agreement was reached on the disputed issue. Since only the section 721 issue remained unsettled and because petitioner wished to receive the actual refund of the substantial overpayments resulting from the allowance of section 722 relief, it was agreed between petitioner and the Office of the Chief Counsel that the disputed issue would be separated from the rest of the case. Accordingly, on September 13, 1951, the case files were referred to the Income Tax Unit with the request that tax liabilities for 1941 and 1944 be recomputed on the basis of denying the relief claimed under section 721. This recomputation increased the petitioner's tax liabilities for 1941 and 1944 over the amounts reflected in the Treasury Department Form 874 agreements executed with regard to those years by $44,420.40 and $29,164.55. Following this recomputation the Office of the Chief Counsel recommended, on November 14, 1951, that the overassessments as redetermined be approved and thereupon reported to the Joint Committee on Internal Revenue Taxation. This was done and the overassessments were reflected on a schedule of overassessments (No. 175050) signed by the Commissioner on December 14, 1951, and refunds were made to the petitioner in January 1952.

Subsequently, on November 12, 1953, respondent sent petitioner the notice of disallowance as required by section 732, disallowing in part petitioner's claim for refund under section 722 and disallowing in full its claims under sections 711 and 721.

In computing its excess profits credits on its returns for 1950 and 1951, petitioner included as admissible assets as of the beginnings of those years, the amounts of net overassessments plus interest for 1941–1945 which petitioner deemed attributable to its applications for relief under section 722 for the years 1940–1945 pursuant to the action of the Excess Profits Tax Council mentioned earlier. Contrawise, respondent in his notice of deficiency for the years 1950 and 1951, denied that petitioner's anticipated refunds of excess profits taxes for the years 1941–1945 constituted admissible assets for the purpose of computing petitioner's excess profits credits for the taxable calendar years 1950 and 1951.

Before beginning a discussion of this issue it should be pointed out that we are not here called upon to determine whether or not the refunds attributable to section 722 relief for the years 1941–1945 are includible in income for 1950 or 1951. Nor are we called upon to decide whether or not the refunds are accruable when petitioner executed Treasury Form EPC–1 on January 27, 1949. This is the position taken by *amicus curiae* on brief.

Instead it is petitioner's contention that the refunds are accruable and may be considered as a part of its "equity capital" under section 437, I. R. C. 1939, on July 28, 1949, the day on which the Chairman

of the Excess Profits Tax Council notified it that the Executive Committee of the Excess Profits Tax Council had approved the amount of its CABPNI's as proposed and agreed to, *supra*, since respondent has delegated his *final* approval authority in respect of this matter to the said Executive Committee.[2]

Petitioner's argument is that once its CABPNI's for the years 1941–1945 had been established and approved all that remained to be done in order to determine the correct amount of the refunds attributable to section 722 relief in regard to those years was arithmetical. Petitioner points to the revenue agent's reports of October 25, 1949; November 29, 1949; and December 7, 1949, as examples of this procedure. It argues that the application of the mathematical computations involves no exercise of discretion on the part of the respondent but is instead purely a ministerial act.

Petitioner further argues that the two issues still in dispute as of the beginnings of the taxable years 1950 and 1951 were non-section 722 issues which were wholly unrelated to, and in no way affected by, the section 722 refunds. In this respect petitioner points out that it is stipulated that even if respondent had prevailed on either or both of these issues the amount of its section 722 refunds would nevertheless not have been decreased nor would it have owed any additional taxes in respect of such open years.

Respondent does not dispute petitioner's right to accrue the amount of the overassessment attributable to section 722 relief for 1940, which amount was agreed to by petitioner on October 25, 1949, and scheduled by respondent in December 1949.

Respondent, however, does dispute petitioner's right to accrue for the purposes of section 437, *supra*, the amounts of overassessments and interest attributable to section 722 relief for the years 1941–1945. He argues that the "potential" refunds attributable to section 722 relief

---

[2] E. P. C. 34 (1948–2 C. B. 106)

Excess Profits Tax Council organization and procedure

\* \* \* \* \* \*

2. GENERAL ORGANIZATION.—The Excess Profits Tax Council consists of not more than 25 members appointed by the Commissioner of Internal Revenue. The Commissioner has designated five members, including the chairman and the vice chairman, as the *executive committee* of the Council and, subject to his authority, has vested in that *committee final jurisdiction* within the Bureau of Internal Revenue of all issues arising under the provisions of section 722 of the Internal Revenue Code.

\* \* \* \* \* \*

5. THE EXECUTIVE COMMITTEE.—The principal functions of the executive committee include: Issuing interpretative rulings or memoranda; *making final determinations with respect to individual cases;* \* \* \*

6. THE COUNCIL.—(a) \* \* \*

(b) Applications for relief under section 722 will be assigned by the chairman to panels of one or more Council members. Such panels will review the record, grant the applicant a reasonable opportunity to have an oral hearing in each unagreed case (and in each case where the panel determines that an agreement entered into with the section 722 field committee should be modified), and prepare a determination setting forth the basis upon which the case is to be disposed of by the Council. *Such determination will become final upon approval by the executive committee.* \* \* \* [Emphasis supplied.]

were too uncertain and speculative on both December 31, 1949, and December 31, 1950, to justify their being accrued by petitioner as assets of its business as at such dates. Respondent's position is that petitioner's refund claims were subject to necessary administrative review and consequently the possibility existed that the refunds might either be disallowed, or substantially reduced in amount by standard issue adjustments which he was free to make at any time. In making this argument respondent does not limit it to the two standard issues which were admittedly in controversy but makes it inclusive of other issues which he might have discovered as the result of his further review of petitioner's claims.

As a part of the above argument respondent directs our attention to section 732 of the 1939 Code. It is his position that a final determination as to petitioner's section 722 claims could not have taken place prior to the issuance of the statutory notice required by that section.

Respondent also refers to section 3777 of the 1939 Code as a restriction upon his authority to make refunds in excess of $200,000. He points out that he is not permitted to make refunds in excess of such amount until 30 days shall have passed from the date upon which a report in regard to the refund is submitted to the Joint Committee on Internal Revenue Taxation. His argument is that the joint committee's review of his decision and the possibility of consequent adverse criticism prevents an accrual of the prospective section 722 refunds prior to the actual scheduling of the overassessments.

In its brief, petitioner emphasizes the well-known rule of tax accounting that for deduction purposes, a tax accrues at the end of the period for which it is imposed for at that time all of the pertinent facts necessary to the accrual are either known or ascertainable. *United States* v. *Anderson*, 269 U. S. 422. Petitioner also points out that a tax refund may accrue for the purpose of income tax inclusion at the time the taxpayer obtains a legal right to the refund even though the amount of the refund is not then definitely fixed, *Continental Tie & L. Co.* v. *United States*, 286 U. S. 290, but concedes that, as in the case of any other liability, an accrual may not be made as long as there is a bona fide dispute between the taxpayer and the taxing authorities as to the existence or application of the tax. *Dixie Pine Co.* v. *Commissioner*, 320 U. S. 516.

While these cases are authority for the accrual of tax refunds for the purpose of income tax inclusion or the accrual of tax payments for the purpose of income tax deduction, this Court has in prior cases established exceptions to the general rules of accrual of contested taxes where the purpose of the accrual was not the inclusion or deduction of tax but was instead the establishment of accumulated earnings and profits for the purpose of properly reflecting them for invested capital credit purposes under the World War II Excess Profits Tax Act

(sec. 718, I. R. C. 1939)·, *Stern Brothers & Co.*, 16 T. C. 295, 322, or the computation of accumulated earnings and profits for the purpose of determining whether or not a corporate distribution was out of earnings and profits. *Estate of Esther M. Stein*, 25 T. C. 940; *Drybrough v. Commissioner*, 238 F. 2d 735 (C. A. 6), reversing 23 T. C. 1105.

In *Stern Brothers & Co., supra,* we held that a contested tax accrues (for invested capital credit purposes) at the close of the year to which the tax relates rather than at the close of the year in which the tax contest is settled. The rationale of our holding was that "[i]f accumulated earnings and profits at the start of any taxable year are to show the *true financial status* of an accrual basis taxpayer, an adjustment must be made for income and excess profits taxes arising in the preceding year [emphasis supplied]," for otherwise a taxpayer, by simply contesting liability, could postpone accrual and thereby increase its profits for the preceding year and in turn its invested capital credit. We regard the converse of this rationale as applicable and pertinent in the instant case.

While our holding in *Stern Brothers* was admittedly an exception to the "contested tax" rule of *Dixie Pine Co. v. Commissioner, supra;* and *Security Mills Co. v. Commissioner*, 321 U. S. 281, we distinguished these cases on the basis of the difference between accrual of Federal income and excess profits taxes for purposes of determining accumulated earnings and profits and the more usual accrual for purposes of deduction from, or inclusion in, net income. The rationale of our holding has since been upheld and the case cited with approval by the Court of Appeals for the Ninth Circuit in *Commissioner v. Pacific Affiliate*, 224 F. 2d 578, affirming 18 T. C. 1175, certiorari denied 350 U. S. 967.

Subsequently, in *H. E. Harman Coal Corporation*, 16 T. C. 787, the taxpayer sought to apply our holding in the *Stern* case, *supra*, in support of its accruals of section 722 refunds for 1940 and 1941 to increase its excess profits credit for the years 1944 and 1945 under the invested capital method.

The facts in *Harman* were that taxpayer's application for section 722 relief as to 1940 and 1941 was filed in September 1943 and subsequently amended in August 1946. Agreements were executed [3] for 1940 and 1941 in June 1948 and October 1947, respectively. In refusing to allow such accruals, we pointed out that under section 722 the excess profits tax must be computed, returned, and paid without regard to the section; that the taxpayer might thereafter make

---

[3] Although it is not clear from the opinion in *H. E. Harman Coal Corporation*, 16 T. C. 787, that the agreements referred to were recorded on Treasury Department Form EPC-1, the stipulation of facts, filed October 10, 1950, appearing in the record of that case, indicates that the taxpayer's agreements were to the amount of the constructive average base period net income under the provisions of section 722. The only official form for recording this type of agreement is Treasury Department Form EPC-1.

application for relief and refund; and that during the intervening period the taxpayer was relieved of no duty to pay and thus was to derive no benefit from the controverted amounts. As noted, the credit in *Harman* was sought to be applied to the years 1944 and 1945, and taxpayer's initial step—the amended application—was not filed until August 1946.

Having thus determined that the refund payments were not so accruable it was unnecessary for us to determine the correct years of accrual. We, nevertheless, stated in dicta that (1) the refunds became such assets on the dates the *"agreements* were made" [4] and (2) "[t]hese refunds are not accruable prior to their *receipt."* (Emphasis supplied.)

Since the dates on which the agreements [5] were made and the date on which the refunds were received by the taxpayer were several years apart, each party to the instant case directs our attention to that portion of the dicta which is favorable. However, as mentioned earlier, petitioner here does not argue that its section 722 refund payments became assets for purposes of determining equity capital on the date it executed Treasury Department Form EPC–1, but instead makes the more conservative argument that its section 722 refunds became assets for the above-mentioned purpose on the intermediate date on which it received notification from the Chairman of the Excess Profits Tax Council that the amounts of CABPNI's agreed upon by it had been approved by the Executive Committee of the Excess Profits Tax Council.

Rather than attempting to clear up the apparent above-mentioned contradiction of the *Harman* case, it seems more profitable to observe that it is not controlling here and to approach the instant case from the standpoint of its particular facts. These facts are (1) the unilateral agreement on Treasury Form EPC–1, designating compromised CABPNI's for the years 1941–1945, was signed by the petitioner on January 27, 1949; (2) the Chairman of the Excess Profits Tax Council notified petitioner on July 28, 1949, that the Executive Committee of the Excess Profits Tax Council had approved the amounts of the CABPNI's appearing in the EPC–1 signed by petitioner; and (3) the overassessments based on the section 722 claims were scheduled on December 14, 1951, and paid to petitioner in January 1952.

The question thus posed is one of determining whether or not the administrative processes incident to the refund of petitioner's World War II section 722 claims had progressed to the stage, as at the beginnings of the taxable years 1950 and 1951, respectively, where it would be correct to hold, for equity capital computation purposes, that the dispute had ended and settlement had been reached. Con-

[4] See footnote 3, *supra.*
[5] See footnote 3, *supra.*

sistent with the *Stern* case, *supra*, the criterion of accrual for this purpose is the disclosure of the *true financial status* of petitioner on the crucial dates.

Applying this test, we believe petitioner should prevail. On July 28, 1949, the date on which petitioner received notification of the Excess Profits Tax Council's approval of petitioner's CABPNI's it was possible to compute the minimum amount of the expected tax refund. This computation in fact was made in the revenue agent's reports of November 29, 1949, and December 7, 1949. While it is true that two standard issues remained in dispute, the stipulation of the parties indicates that even had both of these issues been decided contrary to petitioner's contentions, there still would have been no decrease in the amount of refund as appears on the revenue agent's reports, nor would these issues have affected the refunds otherwise determined under section 722. On the contrary, had either of the issues been decided in petitioner's favor the effect of such decision would have been to increase the amount of the prospective refunds.

As mentioned earlier, respondent argues that he was free at all times prior to a final determination of petitioner's excess profits tax liability to determine additional standard adjustments which would have had the effect of either reducing or eliminating petitioner's expected refunds. Similarly, he argues that petitioner was free at all times prior to the mailing of the section 732 notice of disallowance, and 90 days thereafter, to repudiate its earlier agreement on Treasury Form EPC-1 and to petition this Court for a finding of an increased excess profits tax refund resulting from larger CABPNI's for the respective years.

While we agree with respondent's interpretation of the phrase "final determination" as it appears in section 732 and as it applies to the applicable statute of limitations (see *Hardaway Motor Co.*, 18 T. C. 824, affd. 207 F. 2d 872 (C. A. 5, 1953)), we nevertheless note that it has never been a requisite of income tax accounting that an absolute bar to further litigation be established before a contested tax can be accrued. See *Western Cartridge Co.*, 11 T. C. 246 (1948) ; *Lehigh Valley Railroad Co.*, 12 T. C. 977. Thus, when the Executive Committee of the Excess Profits Tax Council, through its Chairman, notified petitioner that it had approved the CABPNI's agreed upon by it on Treasury Form EPC-1, this notification while not a bar to further litigation yet in a real sense concluded the dispute as to all section 722 issues, especially since the respondent had delegated his approval authority in respect of such issues to the Executive Committee [6] and provided that its action was final.

---

[6] See footnote 2, *supra*.

The taxpayer who receives notification that the Executive Committee of the Excess Profits Tax Council has approved the CABPNI's to which it has agreed on Treasury Form EPC-1 obtains no immediate right to proceed against the respondent to recover the prospective refund. An absolute right to recover the section 722 refund blossoms only upon the scheduling of the overassessment. This is the reason that the date of the scheduling of an overassessment is the correct date for accruing a tax refund for income tax inclusion purposes. (See Issue No. 2, *infra.*)

Like every strict rule, the rule of "absolute right" has the advantage of insuring certainty of application. Its disadvantage is that it fails to provide an accurate and realistic picture of a taxpayer's *true financial status* at any particular moment. It is because of this lack of accuracy that in the area of "accumulated earnings and profits" we permitted an exception to the general rules of accrual. *Stern Brothers & Co., supra; Estate of Esther M. Stein, supra.* We have concluded that the determination of the equity capital of a taxpayer presents an equally meritorious habitat for exception.

In addition respondent argues that the amount of the prospective refund being in excess of $200,000, it was necessary for his Chief Counsel to review the case file and prepare a report for the use of the Joint Committee on Internal Revenue Taxation since section 3777 of the Internal Revenue Code of 1939 denies respondent the right to make such refunds until after 30 days shall have passed from the time such report has been submitted to the joint committee. Respondent contends that this denial of authority constitutes an impediment to accrual for any purpose prior to completion of review by the joint committee.

We cannot agree with either respondent's analysis of his Chief Counsel's review function or his interpretation of section 3777 of the 1939 Code. Respondent's own rules limit the authority of his Chief Counsel to the review of issues arising under sections other than section 722. Mim. 6044, 1946-2 C. B. 97, 102, provides:

12. Chief Counsel's Review of Section 722 Issues.—In any case subject to review by the Chief Counsel, he will accept as final, for the purposes of his review and any report to the Joint Committee on Internal Revenue Taxation, the decision as to section 722 issues contained in reports approved by the [Excess Profits Tax] Council.

Similarly, Chapter 48 of Subtitle F of the Internal Revenue Code of 1939 by implication limits the powers and duties of the Joint Committee on Internal Revenue Taxation to the purposes stated therein. Section 5011 (a) (2) states that it shall be the duty of the joint committee "to investigate the administration of such taxes by the Bureau of Internal Revenue." Section 5012 (a) states that "the Joint Committee on Internal Revenue Taxation * * * is authorized

to secure directly from the Bureau of Internal Revenue * * * information, suggestions, data, estimates and statistics, for the purpose of making investigations, reports and studies relating to internal revenue taxation."

These provisions and section 3777 prescribe a "watchdog" rather than a supervisory function to the joint committee. We do not think that section 3777 represents a legislative attempt to supervise the administration of respondent's refund authority and, for this reason, does not constitute an impediment to earlier accrual.

Section 437 of the Internal Revenue Code of 1939 provides that "the equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time." Respondent argues that this is just another way of stating that the assets in question must be subject to the payment of the taxpayer's debts. In support of this argument respondent cites the following language from *H. E. Harman Coal Corporation, supra,* at page 805:

> The disputed funds (or the right to receive them) did not become subject to payment of petitioner's debts until the above agreement was reached. Until this time the Government owed no duty to petitioner to make the refund. * * *

We are unable to determine the manner in which this language supports respondent's argument. As mentioned earlier in footnote 3, it is our conclusion that the agreement referred to was an EPC–1 form executed by the taxpayer; thus, if the above quotation is applicable at all it is applicable in support of petitioner's position.

The broader principle which we think respondent refers to is that items of income subject to substantial contingencies are not includible in taxable income. L. O. 1086, I–1 C. B. 87. This principle is in turn based on the general rule of accrual "that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income." *Spring City Co.* v. *Commissioner*, 292 U. S. 182 (1934).

While we are in agreement with both of the above-mentioned principles, and furthermore do not believe that petitioner can legitimately claim that it was entitled to the refunds as a matter of right prior to 1951, we nevertheless think, in accordance with our opinion in *Stern Brothers & Co., supra,* that the principle of absolute right is relaxed and the principle of reasonable certainty applies where the question is that of measuring equity capital and true financial status rather than income inclusion. The principle on which the *Stern Brothers* decision is based, namely, *that prolonging a tax controversy should result in no benefit to the party prolonging it,* is still valid. While delay caused by negotiations to develop a mutually satisfactory CABPNI is necessary under the statute, respondent should not benefit from the delay caused by his review of other issues after

petitioner's CABPNI's have been finally approved by the Executive Committee of the Excess Profits Tax Council. The fact that tax refunds resulting from section 722 issues are severable from tax refunds resulting from standard issues is borne out by respondent's action leading to the actual scheduling of the overassessments in 1951.

## Issue 2.

In January of 1952, petitioner received interest in the amount of $150,149.14 in respect of the overassessments of excess profits tax attributable to section 722 relief for the years 1941–1945. The schedule of overassessments reflecting such overassessments was signed by respondent on December 14, 1951.

Thereafter, on December 17, 1952, petitioner filed with the district director of internal revenue for the district of North Carolina an amended Federal income tax return for the taxable year 1949. Included within this amended return was taxable income in the amount of $100,561.92, representing interest, allegedly accrued in 1949, on the overassessments of excess profits tax attributable to section 722 relief for the years 1941–1945, inclusive. The additional tax shown to be due for the year 1949 was paid at the time of the filing of the return.

Respondent states in his notice of deficiency for the taxable year 1951 that the interest on the overassessments of excess profits tax for the years 1941–1945, inclusive, in the amount of $150,149.14 accrued in 1951 and is includible in petitioner's income for that year. Petitioner maintains that the overassessments and the interest incident thereto computed through December 31, 1949, accrued in 1949 and ratably thereafter. Petitioner's argument is that the accrual of interest is necessarily governed by the same principles which govern the accrual of the refunds themselves and therefore, in accordance with our holding in Issue No. 1, interest in the amount of $100,561.92 accrued in the taxable year ended December 31, 1949, and the remaining interest ratably in the years 1950 and 1951. Petitioner has filed a claim for refund in regard to the additional tax paid for the year 1949 as a protective measure pending outcome of this case.

The question posed is whether, for purposes of income inclusion, interest in respect of the overassessments of excess profits tax for the years 1941–1945, inclusive, accrued in the year 1949 and ratably thereafter, as urged by petitioner, or instead, accrued wholly in the year 1951, as urged by respondent.

This Court was presented with the same basic issue in *Household Products, Inc.*, 24 B. T. A. 594 (1931). There we held that the respondent's obligation to pay interest on refunds, and the taxpayer's right to receive such interest arose at the moment the respondent signed the schedule of overassessment, observing that the allowance

of interest by the sovereign is a matter of grace and can be withdrawn or modified at any time. Applying our holding in that case to the facts as presented here, it is clear that the correct year of accrual is 1951.

Petitioner does not disagree with our holding in *Household Products, Inc., supra.* Instead it seeks to distinguish the holding in that case by directing our attention to a comparison of the statutory provision authorizing the payment of interest under the Revenue Act of 1926 [7] and the applicable provision under the Internal Revenue Code of 1939.[8] Petitioner's argument is that whereas payment of interest was, by the terms of the governing statute, conditional upon the allowance of a refund, under section 1116 of the Revenue Act of 1926, "[t]he statute with which we are concerned, * * * Section 3771 of the 1939 Code,[9] states no such condition upon the allowance of interest in respect of overpayments." (Petitioner's reply brief, p. 11.)

We cannot agree with petitioner. While it is true that section 1116 of the Revenue Act of 1926 was repealed by section 614 (c) of the Revenue Act of 1928, and was replaced by section 614 (a) of the same Revenue Act,[10] which latter section now appears in essentially the exact language as sections 3771 (a) and 3771 (b) (2) of the Internal Revenue Code of 1939,[11] it is also evident from the language of these sections that the condition of allowance of interest has not been discarded. In *Pacific Coast Biscuit Co.*, 32 B. T. A. 39 (1935), we explained the changes in the Revenue Act of 1928 applicable to authorization of interest. We stated at page 44:

The effect of this provision, as we read it, was merely to change the termination of the period for which interest was allowable. Under the prior statute

---

[7] SEC. 1116. (a) Upon the allowance of a * * * refund of any internal-revenue tax * * * interest shall be allowed and paid on the amount of such * * * refund at the rate of 6 per centum per annum from the date such tax, penalty, or sum was paid to the date of the allowance of the refund, * * *

[8] SEC. 3770. AUTHORITY TO MAKE ABATEMENTS, CREDITS, AND REFUNDS.
(a) To TAXPAYERS.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) DATE OF ALLOWANCE.—Where the Commissioner has signed a schedule of overassessments in respect of any internal revenue tax imposed by this title, * * * the date on which he first signed such schedule (if after May 28, 1928) shall be considered as the date of allowance of refund or credit in respect of such tax.

[9] SEC. 3771. INTEREST ON OVERPAYMENTS.
(a) RATE.—Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 per centum per annum.
(b) PERIOD.—Such interest shall be allowed and paid as follows:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) REFUNDS.—In the case of a refund, from the date of the overpayment to a date preceding the date of the refund check by not more than thirty days, * * *

[10] SEC. 614. INTEREST ON OVERPAYMENTS.
(a) Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax, at the rate of 6 per centum per annum, as follows:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) In the case of a refund, from the date of the overpayment to a date preceding the date of the refund check by not more than 30 days, such date to be determined by the Commissioner.

[11] See footnote 9, *supra.*

the date of signing the schedule of overassessment marked the end of the interest period; under the 1928 Act the end of the period was not determined by the date of the schedule of overassessment, but ended some time within 30 days prior to the date of the refund check. This change in the statute did not in any way affect the taxpayer's right to interest on an overpayment. The statute still allowed interest and when the Commissioner certified on his schedule of overassessments that this petitioner was entitled to a refund the right to interest thereon became sufficiently fixed to warrant its accrual.

Petitioner's error is in equating the accruability of taxable income with the accruability of tax refunds used solely for the purpose of computing accumulated earnings and profits or, as in this case, equity capital. Where the issue is the correct year of accrual for *income inclusion*, as contrasted with determination of *true financial status* as in *Stern Brothers & Co.*, *supra*, the general rule to which we adhere is that petitioner's right to receive interest arises at the time respondent signs the schedule of overassessments.

## Issue 3.

The Excess Profits Tax Act of 1950 was enacted by the Congress on January 2, 1951, and became law upon the signature of the President at 10:13 a. m. on the morning of January 3, 1951. No Federal excess profits tax law had been in effect throughout the calendar year 1950 but the Excess Profits Tax Act of 1950 by express terms was retroactively applicable with respect to taxable years ending after June 30, 1950.

Petitioner, in computing its excess profits tax credit under section 436 of the Internal Revenue Code of 1939 for its taxable year ended December 31, 1951, did not accrue as a liability in respect of the taxable year ended December 31, 1950, the amount of the excess profits tax liability for that year. Respondent, following Regulations 130, section 40.437-5 (c) (2),[12] adjusted petitioner's equity capital computation as of December 31, 1950, so as to reflect petitioner's excess profits tax liability in respect of the taxable year 1950. The effect of respondent's adjustment was to reduce the amount of petitioner's excess profits tax credit for the year 1951.

Petitioner asserts that respondent's action in adjusting its equity capital as at December 31, 1950, is contrary to the tenets of sound ac-

[12] Regs. 130, sec. 40.437-5 (c) (2) as amended by T. D. 6065, 1954-1 C. B. 163:

In computing liabilities as of the beginning of the taxable year, a taxpayer keeping its books and making its income tax returns on the accrual basis shall, in accordance with the principles applicable in the determination of earnings and profits, treat as a liability the Federal income and excess-profits taxes imposed for the preceding taxable year. This rule is applicable whether or not such taxes were definite and ascertainable in amount at the close of the preceding year and whether or not such taxes were contested by the taxpayer. The provisions of the Excess Profits Tax Act of 1950 shall be taken into account for this purpose in determining the income and excess-profits tax for taxable years ending after June 30, 1950. In general, changes in the Federal income and excess-profits tax laws applicable to a taxable year, enacted after the close of such year, will be taken into account in determining liabilities if the last date prescribed for filing the return for such year is subsequent to the date of enactment of such changes.

counting practice and completely disregards the established concepts of accrual. Petitioner's legal position is that a liability may not be accrued as of a date on which the statute imposing such liability has not been enacted. Applying this proposition to the facts of the instant case petitioner contends that section 436 requires a computation of its equity capital as at December 31, 1950, and that as at that date petitioner's liability to pay a retroactive excess profits tax on its income for the taxable year 1950 was contingent upon the passage of the Excess Profits Tax Act of 1950 by Congress and the signature of the President. It argues that its obligation to pay any excess profits tax with respect to the taxable year 1950 was not fixed as at December 31, 1950, and therefore for purposes of computing its excess profits tax credit for 1951, its equity capital for 1950 should not be reduced by the amount of any excess profits tax liability subsequently determined for that year. Petitioner concedes that its contention here is in conflict with Regulations 130, section 40.437-5 (c) (2), *supra,* but maintains that this regulation is invalid and contrary to established law insofar as it requires the accrual of a yet-to-be-enacted tax.

Respondent's position is that a provision substantially identical to Regulations 130, section 40.437-5 (c) (2), was contained in Regulations 112, section 35.718-2 (a), under the World War II excess profits tax law, and that this regulation was expressly held to be valid in *Stern Brothers & Co., supra,* at pages 322–323. In addition, respondent cites statements of accounting authorities dealing with financial statements under accrual methods.

The parties disagree as to the degree of certainty to be attached to the prospective passage of the Excess Profits Tax Act of 1950 as at December 31, 1950. Petitioner points out that the Act contained several controversial provisions and therefore the possibility of a Presidential veto should not be disregarded. Respondent interprets the Act as simply the fulfillment of a self-imposed mandate prescribed in section 701 of the Revenue Act of 1950, which became law on September 23, 1950.

The legislative history of the Excess Profits Tax Act of 1950 indicates that the bill was originally advocated by the President, the conference committee's report favoring passage of the Act was promulgated on December 22, 1950, and the conference bill was adopted by the Senate on the same date.

Respondent regards this legislative history as providing a tangible basis for the existence of the petitioner's liability and therefore claims the regulation was warranted as an expression of sound accounting principles.

In comparing Regulations 112, section 35.718-2 (a), with Regulations 130, section 40.437-5 (c) (2), we have come to the conclusion that the contents of each are sufficiently different as to negative re-

spondent's suggestion that our decision in *Stern Brothers & Co., supra,* upholding the validity of the former regulation, is controlling as to the latter regulation. Regulations 112, section 35.718-2 (a), speak only of the subtraction of income and excess profits taxes for the preceding taxable year and make no mention of taxes which were not definite or ascertainable in amount at the close of the preceding year due to the enactment of a retroactively applicable taxing act. As we read the facts of *Stern Brothers & Co., supra,* the question of the retroactive application of a tax liability was not there in issue.

We however have come to the conclusion that the *Stern Brothers* opinion is of value in enunciating a general principle applicable alike to a determination of equity capital at any specific time. This principle is that to "show the *true financial status* of an accrual basis taxpayer" (emphasis supplied) as at any specific moment, it is necessary to adjust equity capital by the amount of excess profits taxes arising in the preceding year. Petitioner's argument is that the tax liability here in question did not "arise" in the preceding year but instead was imposed retroactively by the Excess Profits Tax Act of 1950. While for income tax inclusion or deduction purposes petitioner's argument has merit (see *Union Bleachery* v. *Commissioner,* 97 F. 2d 226; and *Van Norman Co.* v. *Welch,* 141 F. 2d 99; but see *Fawcus Machine Co.* v. *United States,* 282 U. S. 375), nevertheless such a holding when applied to a taxpayer's equity capital computation leads to a patently inaccurate conclusion of financial worth. This is because the computation as at December 31, 1950, would reflect the total of petitioner's net earnings after income tax for that year, but would not reflect the excess profits tax subsequently imposed upon those earnings.

Because of this circumstance, we hold that section 40.437-5 (c) (2) of Regulations 130, insofar as it applies here, is a reasonable interpretation of section 437 (c) of the Internal Revenue Code of 1939. Respondent was therefore not in error in requiring an adjustment of petitioner's equity capital as at December 31, 1950, for purposes of determining petitioner's 1951 excess profits tax credit. The petitioner had more than 1 full year before filing its return for 1951 to make the required adjustments to its opening balance sheet.

Petitioner's final argument is that an application of Regulations 130, section 40.437-5 (c) (2), involves an exception to the rule of *Security Mills Co.* v. *Commissioner, supra,* which held that income and deductions are to be determined upon the basis of a fixed accounting period and that a contingent liability which is dependent on the last day of the accounting period upon a future event may not be treated as a deductible accrued liability for the taxable year. A similar argument was rejected by the Court of Appeals for the Ninth Circuit in

*Commissioner* v. *Pacific Affiliate, supra,* the court citing and relying upon *Stern Brothers & Co., supra.* In *Pacific Affiliate* the issue was the proper time for the accrual of an excess profits tax liability for the further purpose of determining accumulated earnings and profits. We think that equity capital is sufficiently akin to accumulated earnings and profits as to be governed by the same general rule.

*Issue 4.*

Following the hearing in this case petitioner filed a motion with this Court requesting permission to amend its petition so as to place in issue a question of abnormal income for the year 1951. It was agreed that this issue need be settled only in the event that we held that the interest from World War II excess profits tax overassessments in the amount of $150,149.14 was wholly accruable, for income and excess profits tax purposes in the taxable year 1951. (See Issue No. 2.) Respondent indicated his consent to the amendment and the motion was granted. Since we have held that the total interest from such tax overassessments was includible in the year 1951, it is therefore necessary for us to further determine whether such interest constitutes "abnormal income" for the year 1951 within the meaning of section 456 of the Internal Revenue Code of 1939.

For the purposes of this issue the parties have filed a supplemental stipulation which includes the following information:

The amounts of petitioner's gross income arising out of claims, awards, judgments, or decrees, or interest on any of these (other than interest on petitioner's Federal excess profits tax refunds for the taxable years 1941–1945, inclusive, under section 722 of the Internal Revenue Code of 1939), for the years 1947–1950, inclusive, consist of the following:

|  | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Interest on Federal tax refunds | $3,880.78 | $10,662.48 | $4,458.23 | $31,013.05 |
| Refund of North Carolina taxes | 18,052.41 | | | |
| Interest on North Carolina income taxes | | 72.51 | | 2,373.48 |
| Total | 21,933.19 | 10,734.99 | 4,458.23 | 33,386.53 |

The average amount of petitioner's gross income arising out of claims, awards, judgments, or decrees, or interest thereon (other than interest on petitioner's Federal excess profits tax refunds for the years 1941–1945, inclusive, under section 722 of the Internal Revenue Code of 1939), for the taxable years 1947–1950, inclusive, is $17,628.24. For purposes of section 456, interest amounting to $150,149.14 is attributable to the following taxable years in the following respective amounts:

| Year | Interest attributable | Year | Interest attributable |
|---|---|---|---|
| 1945 | $4,136.10 | 1950 | $29,500.03 |
| 1946 | 13,701.39 | 1951 | 20,087.19 |
| 1947 | 13,120.10 | | |
| 1948 | 32,635.91 | Total | 150,149.14 |
| 1949 | 36,968.42 | | |

The applicable portion of section 456 of the Internal Revenue Code of 1939 appears in the margin.[13] While we observe that it was not abnormal for petitioner to derive income "arising out of a claim, award, judgment, or decree, or interest on any of the foregoing," it nevertheless seems evident that it was abnormal for petitioner to derive income of this class for any year in such a large amount. Since the total interest from the refund overassessments includible in petitioner's gross income for 1951 under subchapter D, is in excess of 115 per centum of the average amount of petitioner's gross income of the same class for the 4 previous years, and is attributable to previous years, we hold that such interest income constitutes abnormal income within the meaning of section 456 of the Internal Revenue Code of 1939 and that petitioner is entitled to the benefits of that provision in computing its tax.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[13] SEC. 456. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, * * *

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; * * *

*     *     *     *     *     *     *

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Secretary. * * *