*Decisions will be entered under Rule 50.*

BELL AIRCRAFT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68395.   Filed May 14, 1959.

*Richard E. Moot, Esq., Walter C. Lindsay, Esq.,* and *Mason O. Damon, Esq.,* for the petitioner.

*Emil Sebetic, Esq.,* for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the petitioner's income and excess profits taxes for the year 1952 in the amount of $946,467.11.

The issue before us is whether, under section 456 of the Internal Revenue Code of 1939,[1] the petitioner is entitled, in computing its excess profits tax for 1952, to exclude from its gross income the income arising from a judgment to the extent that such income is attributable to years prior to 1950.

### FINDINGS OF FACT.

The stipulated facts are herein incorporated by this reference.

Bell Aircraft Corporation, the petitioner, is a corporation organized under the laws of the State of New York with its principal office and place of business in the town of Wheatfield, Niagara

---

[1] All section references are to the Internal Revenue Code of 1939, as amended.

County, New York. It filed a timely income and excess profits tax return for the year 1952 with the district director of internal revenue at Buffalo, New York. For all years since its incorporation in 1935, the petitioner has kept its books and filed its Federal income and excess profits tax returns on a calendar year and an accrual basis.

From 1935 until 1945 the major part of the petitioner's business was the development and manufacture of military aircraft. In 1936, 1937, and 1938 the petitioner entered into certain fixed-price or FP contracts with the United States through the United States Army Air Corps, for the construction of experimental and service test airplanes. In the performance of these experimental contracts the petitioner incurred, in 1936 through 1940, substantial expenditures over and above amounts received, which costs were set up on the petitioner's books as deferred charges applicable to anticipated future production. Petitioner acquired a number of basic patents in connection with its development work, on which substantial royalties were realized. By December 31, 1940, the petitioner had capitalized and deferred these experimental, development, and production tooling expenditures in the amount of $3,422,870.23. The sum of $48,405.23 had been disallowed by Army audit, leaving a net amount subject to amortization of $3,374,465. Out of the total of deferred expenses, the amount of $1,499,739.23 was due to experimental and development costs incurred by the petitioner under its experimental contracts of 1936, 1937, and 1938 when it experimented on three types of airplanes; while the amount of $1,874,725.77 was due to production tooling costs incurred in 1939 and 1940 for the production of the P-39, Airacobra, airplane, for which the petitioner received its first contract (fixed price) in 1939. Production tooling is distinguished from ordinary machine tools in that the latter are more permanent and universal in character, consisting of milling machines, lathes, drill presses, etc., not restricted in use to specific models or types of the product manufactured. Production tooling for the P-39 was largely assembly tooling, consisting of long-beam assembly, subassembly, and tail-assembly features, all of which were fabricated in structural steel and remained in use as long as this type of airplane was in production. It also included metal tubes, angles, form blocks, jigs, router templets, and templet dies.

The petitioner originally planned to amortize these deferred costs of $3,374,465 on the basis of the number of planes delivered and to be delivered on all production contracts, fixed-price as well as cost-plus-fixed-fee, on hand at the end of each year and by prorating such costs annually against deliveries made during the current year. However, petitioner's officials had been advised by Army Air Corps officials that the deferred expenses in question might not be approved for reimbursement under the cost-plus-fixed-fee, or CPFF, contracts then being negotiated. To avoid any question of allowable reimburse-

ment, petitioner changed its original plan of amortization by limiting the allocation of the deferred charges to its fixed-price production contracts only. By the end of 1942 the petitioner had amortized all of its deferred experimental, development, and production tooling expenses against deliveries under its FP contracts for the years 1940, 1941, and 1942.

In April 1939 the petitioner entered into a fixed-price contract for the production of the P–39, Airacobra, which was one of the several types of fighter planes upon which the petitioner had conducted experimental work in the prior years. Thereafter, the petitioner was awarded additional production contracts for the P–39, Airacobra. The earlier production contracts were fixed-price but commencing on August 14, 1941, the petitioner entered into a series of CPFF contracts with the United States, through the U.S. Army Air Corps, for the production of the P–39, Airacobra. Under the CPFF contracts the United States agreed to reimburse the petitioner for the cost of manufacturing and in addition to pay the petitioner a fixed fee as provided in each of such contracts.

In 1942, at which time the petitioner was engaged in production under the CPFF contracts, the Commissioner of Internal Revenue required that, for Federal income tax purposes, the experimental, development, and production tooling expenses should be allocated to airplanes produced under CPFF contracts as well as the FP contracts. The Commissioner adjusted the petitioner's income for 1941 and 1942 by allocating the amortization of such expenses to airplane deliveries under both the FP and CPFF contracts. By reallocating $2,286,819.95 of the $3,374,465 of deferred expenses to the CPFF contracts, the petitioner's income from its FP contracts was increased by such amount and the Commissioner made additional assessments against petitioner's resulting net income for the years 1941 and 1942 in the approximate amount of $1,337,474.89. The amount of $2,286,-819.95 disallowed by the Commissioner as a deduction from the petitioner's FP contract income in 1941 and 1942 was allowed by him as a deduction in determining petitioner's net income under the CPFF contracts for Federal income tax purposes for the years 1942 through 1945, as follows:

| Year | Amount allowed as a deduction |
|---|---|
| 1942 | $456, 831. 19 |
| 1943 | 1, 226, 443. 58 |
| 1944 | 360, 846. 03 |
| 1945 | 273, 678. 40 |
| Total | [1] 2, 317, 799. 20 |

[1] This exceeds by $30,979 the amount of $2,286,819.95 claimed for reimbursement and awarded petitioner by the Court of Claims judgment. The difference represents the proportion attributable to CPFF contracts of $48,405.23 costs disallowed by Contract Audit Section, Army Air Forces, but which were allowed for tax purposes, less $2,892.19 disallowed for tax purposes, but allowed for reimbursement.

Following the Commissioner's reallocation of the deferred expenses to both FP and CPFF contracts, the petitioner, on September 7, 1943, contacted the Price Adjustment Board, War Department, and requested permission to restore to the deferred expense account the proportion of experimental, development, and production tooling expenses applicable to CPFF contracts. Approval of such request was indicated by the Price Adjustment Board, and on September 9, 1943, the petitioner restored to the deferred expense account the amount of $2,286,819.95 of this total amount; $1,035,918.73 represented experimental and development expenses, and $1,250,901.22 represented production tooling costs.

Reimbursement vouchers were submitted by the petitioner for the proportion of the experimental, development, and production tooling expenses applicable to deliveries under the CPFF contracts during 1942 in the amount of $451,179.96 and to deliveries under the CPFF contracts during January to August 1943 in the amount of $848,676.06. Such vouchers were approved by the contracting officer and payment was received by the petitioner from the United States on August 27, 1943, September 3, 1943, and September 10, 1943, in the total amount of $1,299,856.02. Subsequently, the Comptroller General of the United States disallowed these payments and by September 1944 the entire amount of $1,299,856.02 was recouped from the petitioner. Reimbursement vouchers totaling $986,963.93 were submitted by the petitioner in the period from October through December 1943 ($267,996.28) and in December 1944 ($718,967.65) for all the remaining experimental, development, and production tooling expenses applicable to CPFF contracts. The contracting officer disapproved these vouchers totaling $986,963.93 on March 1, 1945, and they were not paid. By August 14, 1945, all work was completed or terminated on the CPFF contracts under which these vouchers totaling $2,286,819.95 had been submitted, and the petitioner's CPFF contracts then in progress were terminated for the convenience of the Government. Petitioner reserved the right to seek reimbursement of the disallowed experimental, development, and production tooling expenses.

In July 1947 the petitioner instituted an action in the United States Court of Claims against the United States to recover a total of $2,286,819.95, representing the deferred expenses which the petitioner alleged were due under the above-described CPFF contracts. On October 2, 1951, the Court of Claims rendered its decision directing judgment in favor of the petitioner in the amount of $2,286,819.95 (100 F. Supp. 661), holding that the petitioner's deferred experimental, development, and production tooling costs were actually a valid part of the cost of producing each item under both the FP and

the CPFF contracts. This judgment was affirmed by the United States Supreme Court on October 27, 1952 (344 U.S. 860). The amount of said judgment, plus interest thereon of $105,862.02, was included by the petitioner in its gross income for 1952.

In its excess profits tax return for 1952 the petitioner claimed that the income from said judgment in the amount of $2,286,819.95, plus the interest thereon, was excludible from its excess profits net income as abnormal income under section 456(a)(2)(A) attributable to prior years. Respondent, in his notice of deficiency, stated that these amounts did "not constitute abnormal income within the definition prescribed in Section 456 of the Internal Revenue Code of 1939."

During the years 1948 through 1951 the petitioner had income arising out of claims, awards, judgments or decrees, or interest on any of the foregoing, which was includible in its gross income for those years, as follows:

| Year | Amount |
|------|--------|
| 1948 | $137,042.33 |
|      | 9,000.00 |
| 1949 | 6,500.00 |
| 1950 | 30,854.39 |
| 1951 | 0 |

OPINION.

When there is eliminated from the foregoing recitation of facts the nonessential circumstances of the original allowance and payment of items of experimental, development, and production tooling costs, and the later recoupment by the United States of the amount of such payments, the case in the Court of Claims emerges as an action for sums due under the four CPFF contracts. This is apparent from the first few sentences of Judge Howell's opinion in the Court of Claims:

Plaintiff sues to recover $2,286,819.95 alleged to be reimbursable items of cost incurred in the performance of four cost-plus-a-fixed-fee contracts (hereinafter referred to as CPFF contracts) for the manufacture and delivery of military aircraft known as P-39's or Airacobras, entered into with defendant through the United States Army Air Corps.[1] Of the total sum claimed to be due under the contracts, $1,035,918.73 represent experimental and development expense, and $1,250,901.22 represent production tooling cost.[2] It is plaintiff's contention that the sum in suit represents allowable costs which should have been reimbursed pursuant to all four CPFF contracts which provide in pertinent part as follows: [Footnotes omitted.]

After the above there appears in said opinion quotations of "*Reimbursement for Cost*" paragraphs from the four CPFF contracts and pertinent portions of T.D. 5000.

The holding of the opinion as expressed in the closing lines, is as follows:

Under the clear provisions of plaintiff's CPFF contracts and T.D. 5000, a portion of plaintiff's deferred experimental, development, and production tooling expenses were allowable items of cost and should have been reimbursed. The portion sought to be amortized against the CPFF contracts and claimed as allowable costs subject to reimbursement * * * represents a reasonable allocation of such costs on the basis of all production contracts. The sum so allocated is $2,286,819.95 and plaintiff may have judgment for that amount.[7] [Footnote omitted.]

It is so ordered.

The remaining issue in this case is whether the judgment ordered by the above opinion, and received by the petitioner in 1952, is "abnormal income" within the meaning of section 456,[2] and, therefore, not includible in the computation of petitioner's excess profits tax for said year.

In order to qualify for relief under this section, the petitioner must establish, within the framework of the statute and the applicable regulations, (1) the class and amount of abnormal income in the taxable year; (2) the amount of net abnormal income derived therefrom; and (3) the portion of net abnormal income which is attributable to other years. *E. W. Williams Publications, Inc.*, 25 T.C. 282.

At the trial of this case respondent asserted what he calls "a broad general defense to petitioner's claim." It was so broad that respondent then asserted the income arising from the Court of Claims judgment was not income arising out of a judgment, thus driving petitioner to the ridiculous position of defending, on brief, that the judgment income was really judgment income.

Respondent now concedes on brief that the Court of Claims judgment of $2,286,819.95 and the interest thereon of $105,862.02 which was properly included in petitioner's gross income for 1952, constitutes abnormal income under section 456(a)(2)(A) as "[i]ncome arising out of a claim, award, judgment, or decree, or interest on any of the foregoing." He also concedes petitioner's net abnormal income in 1952 from the judgment is the amount claimed by petitioner or the sum of $2,094,786.36. This leaves only the question as to the attribution of this net abnormal income from the judgment to the years prior to 1950.

---

[2] SEC. 456. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing ; or

Section 456(b) provides that "[t]he amount of the net abnormal income that is attributable to any previous * * * taxable year or years shall be determined under regulations prescribed by the Secretary."

In accordance with the direction of the above statute, respondent has promulgated general regulations that are to govern the attribution of net abnormal income to previous taxable years and specific regulations when that net abnormal net income is of the first class mentioned in the statute, i.e., income arising out of a judgment.

In Regulations 130, section 40.456-3(b), it is stated generally that "[i]tems of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events."

In Regulations 130, section 40.456-6 (which is not even referred to in respondent's brief), respondent promulgated the specific regulation that is to govern when the attribution of net abnormal income to previous taxable years consists of judgment income. This regulation provides, in part:

Reg. 130, Sec. 40.456-6. Income arising out of a claim, award, judgment, or decree, or interest thereon. * * *

(b) In determining the portions of income of the class described which are attributable to other taxable years, due regard shall be given to the nature of the claim upon which the recovery is founded. Allocation will generally be made to the year or years during which occurred the exploitation, removal, or use, as the case may be, of the property right forming the subject matter of the claim, award, judgment, or decree. * * *

The circumstances of the instant case bring the judgment income so clearly within the permissible attribution to previous years that it hardly tests the reach of the statute and applicable regulations. Here the admitted facts show a judgment rendered in 1952 granting petitioner recovery for reimbursable items of cost incurred in the performance, during the years 1941 to 1945, of certain contracts; the court rendering the judgment holding that such items of cost were so incurred in the performance of such contracts during such period and were reimbursable under the terms of the contracts. It is admitted that by August 14, 1945, all of the work had been done in connection with the contracts on which the recovery was based; that all of such contracts had been completed or had been terminated and all of the cost held by the Court of Claims to be reimbursable had been incurred by August 14, 1945.

Attributing the judgment income founded on the items of performance cost to the years of performance of the contracts is certainly attributing it "in the light of the events in which such items had their origin" within the provisions of Regulations 130, section 40.456-3(b), previously quoted. Such attribution clearly gives "due regard * * * to the nature of the claim upon which the recovery is founded" within

the provisions of Regulations 130, section 40.456–6(b), previously quoted. Indeed, the instant case is much similar to the examples set forth in the last-cited regulation where abnormal net income in the form of a judgment will be attributed to prior years. The regulation gives judgments in patent infringement suits, suits based on removal of minerals, and awards of War Claims Commission for past losses, as examples where attribution will be made to the years of the infringer's use, the years during which the mineral was removed, or the years in which the claimed losses occurred in the case of the award by the War Claims Commission.

Respondent makes some argument that the instant case is within the provision of that portion of Regulations 130, section 40.456–3(b), which prohibits attribution of net abnormal income in the following language:

No portion of an item of net abnormal income is to be attributed to any previous year *solely* by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income. [Emphasis supplied.]

There is no merit in respondent's argument. It is true that in the years 1936 to 1940 petitioner incurred experimental and development costs in early experimental work with several types of airplanes and it also incurred expenditures for production tooling to be used in performing the subsequent production contracts for the P–39, Airacobra. But the recovery in the Court of Claims was not founded upon an investment in assets. It did recognize that petitioner had made an investment in assets but the recovery was for reimbursable costs incurred in the performance of contracts during 1941–1945 and not a recovery based *solely* by reason of the investment in assets. There is nothing in the quoted language of the regulation prohibiting attribution of the judgment income to prior years merely because in the past the taxpayer has made an investment in assets. This is made manifest by the example given in Regulations 130, section 40.456–6(b). In the case of abnormal income from a judgment for infringement of a patent, the patent owner must at some time have made an investment in the patent. And in the case of a judgment for removal of minerals, the owner has at some time necessarily made an investment in the mine. We hold the net abnormal income arising from the 1952 judgment is not being attributed by the petitioner to prior years solely by reason of an investment in assets in prior years.

Respondent argues that "the effect of petitioner's contentions with respect to attribution is to request this Court to shift the taxability of the judgment for excess profits tax purposes from 1952 to pre-excess profits tax years by altering the established method by which petitioner accounted for its income to achieve a tax benefit." Respondent

cites *Yuba Gardens, Inc.*, 17 T.C. 334; *R. H. Bogle Co.*, 10 T.C. 1282; *Geyer, Cornell & Newell, Inc.*, 6 T.C. 96; and *E. T. Slider, Inc.*, 5 T.C. 263. In the *Bogle* case, *supra*, the taxpayer made a sale of real estate in 1941 and elected to report the gain thereon, for income tax purposes, on the installment basis for the years 1941, 1942, and 1943. In computing its excess profits tax for the years 1942 and 1943 the taxpayer sought relief under the then section 721. This Court held that the taxpayer was not entitled to attribute the income to 1941 after having chosen the benefit of an election to spread the gain over a 3-year period. In the *Yuba Gardens* case, *supra*, a cash basis taxpayer sought to attribute abnormal income to other years when it would have been includible in income on an accrual basis. This Court, denied such attribution saying that the taxpayer was "in effect, seeking to have this Court approve a change in its method of reporting income from the land contracts from the cash method to an accrual method for the purpose of attributing income received in the taxable years to other years." These cases, and the others cited by the respondent to support this argument, are not applicable here.

Petitioner has always kept its books and reported its income on an accrual basis. It has not attempted to change this method of accounting. There is here no question of any election to report a segment of its income in any particular way. The deferred costs were properly deducted in the years 1942 through 1945 and the respondent allowed such deductions. Petitioner was refused reimbursement of these costs by the United States simply because of a dispute over the proper interpretation of the cost-plus-a-fixed-fee contracts. When the Court of Claims rendered its judgment in 1951, and such judgment was affirmed by the Supreme Court in 1952, the petitioner included the amount of such judgment in its income for 1952. There was no attempt by the petitioner to seek attribution of this income to previous years on the basis of any changed accounting method. Instead, the attribution was made to years prior to 1950, in the light of the events in which such items of income had their origin. Regs. 130, sec. 456–3; see also *A B C Brewing Corp.*, 20 T.C. 515. We think this argument of the respondent is without merit.

Respondent makes an alternative argument that the petitioner is not entitled to relief because its net abnormal income is attributable to the years 1942 through 1945, which are World War II excess profits tax years. Since the World War II excess profits tax rates were greatly in excess of the Korean war rates, runs the argument, and since the petitioner was liable for the World War II tax in each of the years 1942 through 1945, the attribution of the income in question to the years 1942 through 1945 would result in a higher

tax under section 456(c) than would result if the abnormal income were taxed in 1952 at Korean war excess profits tax rates.

There is no merit in respondent's argument. We are here concerned only with the excess profits tax imposed by the Excess Profits Tax Act of 1950, which added subchapter D to chapter 1 of the 1939 Internal Revenue Code, and it is applicable by its terms only to years ending after June 30, 1950. Sec. 430. The regulations promulgated by the respondent make it clear that all references to the "excess profits tax" under the regulations are to the tax imposed by the Excess Profits Tax Act of 1950, and that "[s]uch tax is to be distinguished from the excess profits tax imposed by subchapter E of chapter 2 of the Internal Revenue Code for taxable years beginning after December 31, 1939, and before January 1, 1946." Regs. 130, sec. 40.0.

Section 456(c), which provides for the computation of the excess profits tax under the Excess Profits Tax Act of 1950 in those situations where abnormal income exists, provides as follows:

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

It is apparent that section 456(c) is concerned only with the excess profits tax under subchapter D. Subparagraph (2) is explicit that where net abnormal income is attributable to any previous year, the excess profits tax for each such previous year must be the tax computed under the Excess Profits Tax Act of 1950. This could not be plainer. Consequently, where, as here, the amounts of net abnormal income are attributable to years prior to 1950, then such amounts are "to be eliminated from further consideration in the excess profits tax computation." *A B C Brewing Corp.*, *supra;* see also *Triboro Coach Corporation,* 29 T.C. 1274.

In *American Enka Corporation,* 30 T.C. 684, which involved abnormal income under section 456, a part of the net abnormal income in 1951 was attributable to 1945, a World War II excess profits tax year. This Court held that "such interest income constitutes abnormal income within the meaning of section 456 of the Internal Revenue Code of 1939 and that petitioner is entitled to the benefits of that provision in computing its tax."

We hold that the net abnormal income in the amount of $2,094,-786.36, which arose in the year 1952, is attributable to years prior to 1950, and, consequently, is to be eliminated from any computation of the excess profits tax under section 456 (c).

*Decision will be entered under Rule 50.*