CONTINENTAL CAN COMPANY, Inc.

v.

The UNITED STATES.

No. 102–64.

United States Court of Claims.

Feb. 20, 1970.

Robert B. Hodes, New York City, for plaintiff; Thomas N. Tarleau, New York City, attorney of record. Willkie, Farr & Gallagher and Nicholas J. Sheppard, New York City, of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

---

\* The dissenting opinion of Skelton, Judge, in which Collins, Judge, and Nichols, Judge, join, follows the opinion of the trial commissioner which has been adopted by the court.

1. The petitions filed by plaintiff in Case Nos. 130–67 and 131–67, claiming $1,-

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on February 27, 1969. Plaintiff filed no exceptions to the commissioner's findings of fact but did except to his opinion and recommended conclusion of law. Defendant requested adoption of the findings of fact and the recommended conclusion of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.\* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

GAMER, Commissioner: Plaintiff seeks recovery of over $3,150,000 as claimed overpayments of federal income and excess profits taxes, and interest paid thereon, for plaintiff's calendar year 1951, plus statutory interest.[1]

Plaintiff (hereinafter sometimes referred to as "Continental") has long been a manufacturer of can containers for food, beverages, and other products.

For over 35 years prior to January 1, 1951 (*i. e.*, ever since its incorporation in 1913), plaintiff, as an incident of the sale of cans to its customers (canners), installed in their plants certain equipment which effected proper closure of the cans. During that period, plaintiff

264,630 and $751,779, respectively, with respect to 1952 and 1953, involve the same issues as the instant claim. Proceedings in such two cases have been suspended pending the disposition of this case.

leased the equipment to its customers at nominal rentals under an arrangement, however, whereby the user of the equipment was obliged to purchase its can requirements from plaintiff. Plaintiff leased the equipment only to its container customers. Plaintiff's can-closing machines were not held for sale and (except for a few isolated and immaterial instances) were not sold.

In August 1946, the Government instituted an action in the District Court for the Northern District of California against Continental for alleged violation of the Sherman and Clayton Acts. The action was in part based upon Continental's restricted sales policy and its practice of tying the sale of containers into the leasing of the closing equipment. The Government sought either (a) divestitute of the closing-machine part of Continental's business, or (b) a judgment declaring Continental's arrangement with its customers to be illegal and requiring it to either sell or lease its closing machines to any applicant on nondiscriminatory terms.

The American Can Company, the country's largest manufacturer of food and beverage containers (Continental being the next largest) had engaged in substantially the same practices. At the same time that the Government instituted its action against Continental, it also brought a similar action in the same court against American Can.

In September 1949, the Government and Continental entered into a stipulation whereby further proceedings in Continental's case were suspended pending a final decision in the *American Can* case. Continental agreed that, if a decree would be entered against American Can in its case, a similar decree could be entered against Continental at the same time, with the proviso, however, that Continental's decree would contain no provision requiring divestiture of the closing machine portion of its business even though American Can would be ordered to divest. If American Can were ordered to divest, Continental was left free to litigate such question in its case.

On November 10, 1949, American Can's activities were found to be in violation of the Sherman and Clayton Acts. United States v. American Can Co., 87 F.Supp. 18 (N.D.Cal.). In the subsequent proceedings to determine the appropriate remedy, the Government urged divestiture. In opposing such divestiture, American Can offered to undertake a closing equipment sales program as part of its business operations. The court approved this proposal. Accordingly, divestiture was not ordered. See American Can Company v. C. I. R., 317 F.2d 604 (2d Cir. 1963), cert. denied, 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 479 (1964).

After negotiations between Continental and the Government with respect to the wording of the final judgment and decree to be entered against Continental, the court, on June 26, 1950, entered such a judgment and decree. In accordance with the provisions of the stipulation, divestiture was not ordered. Continental was directed, however, to cease its discriminatory closing equipment sales and leasing practices. The effective date of the injunctive provisions and the provisions concerning nondiscriminatory sales and leasing was January 1, 1951.

The decree stated, under the heading "Policy," that it was its purpose "to assure to those interested in owning container closing machines * * * the opportunity to purchase such machines * * * owned or controlled by defendant as of January 1, 1951," and that, with respect to equipment manufactured after such date, Continental was "to adopt a policy of affording to all those desiring such machines or equipment every available economic incentive to purchase such machines and equipment." Under the heading "Closing Machines—Sale," Continental was directed to sell, for a ten-year period, "to any applicant * * * in accordance with and subject to the provisions of this Judgment, any container closing machine which it owns on the effective date of this provision, or thereafter manufactures or acquires." The decree further provided that exist-

ing lessees should, by a special communication, be advised of their prior right to purchase, at prices calculated in accordance with a formula established in the decree, the closing machinery then in their possession. Further, plaintiff was ordered in the future to sell or lease to any applicant machinery that it was then selling or leasing to its container customers. In order to insure that plaintiff complied with these and other provisions of the decree a special master was appointed to supervise such compliance, gather information regarding plaintiff's actions, and report to the Attorney General. (The master was the same one appointed pursuant to the corresponding portion of the American Can decree.)

Thereafter, plaintiff developed a program, including advertising materials, circulars, and specially prepared letters, to promote the sales of the equipment. Among other things, it furnished all of its lessees information concerning the methods, terms, and advantages of owning the equipment.

After January 1, 1951, plaintiff, in compliance with the decree, granted each of its closing equipment lessees an option to purchase and, further, embarked upon a general sales program designed to sell the machines.

Substantially all of the lessees then in possession thereafter proceeded to purchase the equipment. During the year 1951, plaintiff realized gross receipts of $4,005,899 from such sales of closing equipment which plaintiff had owned for more than six months prior to January 1, 1951. Net gains in the amount of $1,720,639 were realized from such sales.

In its 1951 tax return, plaintiff reported such sum of $1,720,639 as gains from the sale of capital assets held for more than six months. Section 117(j) of the 1939 Internal Revenue Code provides capital gains treatment for sales of "property used in the [taxpayer's] trade or business," which is defined, insofar as is here pertinent, as property (a) of a character that is subject to a depreciation allowance, (b) is held for more than six months, and (c) is not "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

However, when, in 1951 and the years thereafter, plaintiff sold closing equipment manufactured or acquired prior to 1951 to those not lessees-in-possession, or sold equipment manufactured or acquired after January 1, 1951, either to lessees-in-possession at the time of the sale or to those who were not leasing the purchased equipment at such time, it reported the gains derived from such sales as ordinary income.

After an audit of plaintiff's said 1951 tax return (by the District Director of Internal Revenue, Manhattan, New York), defendant made a determination that the $1,720,639 gain did not qualify for capital gains treatment because, in its opinion, the closing equipment constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" under section 117(j). Accordingly, plaintiff's tax was recomputed on the basis of such gain's constituting ordinary income. On this basis, such amount also became includable in plaintiff's excess profits net income and was so included in defendant's recomputation of plaintiff's excess profits tax for such year.

After payment of the claimed deficiencies, with interest, plaintiff filed a claim for refund of income taxes (plus interest) in the amount of $3,157,721, or, in the alternative, for refund, even if the gain were held to constitute ordinary income under section 117(j), of the assessed deficiency with respect to the excess profits taxes (plus interest), in the amount of $1,327,518, such alternative claim being based on a contention that income of the type herein involved falls within the "abnormal income" exception contained in the statutory provisions relating to the excess profits tax. More than six months having passed without any action on the claim having been taken by the Commissioner of In-

ternal Revenue, the petition herein was timely filed.[2]

## THE INCOME TAX ISSUE

There is no dispute concerning the closing equipment in question constituting property subject to depreciation and, as of the dates of sale in 1951, having been held by plaintiff for more than six months. The only dispute between the parties is whether the equipment constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." And, as stated, the only equipment involved in such dispute is that manufactured or acquired by plaintiff prior to January 1, 1951 (the effective date of the decree), which was on lease and sold to lessees-in-possession during the year 1951.

Plaintiff, pointing to the long period of time prior to 1951 during which it held the machines only for rental purposes, contends that, as of the 1951 sales dates, the machines had not been held "primarily" for sale to customers. The evidence shows that some machines sold in 1951 had been held by plaintiff as long as thirty years. The average age of the machines sold was at least 16.6 years.[3] Because of such extended period during which rental was the sole basis of holding, and, on a comparative basis, the brief period, i. e., only portions of the year 1951, during which the machines had been held for sale, it becomes manifest, says plaintiff, that on an overall basis the property had been held "primarily" for rental and not for sale. And, it also argues, because of such long holding the gain resulted from a " 'realization of appreciation in value accrued over a substantial period of time,' " Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), i. e., the

type of gain normally entitled to capital gains treatment.

Further it contends that the closing equipment sales did not result from an activity arising from the "mainstream" and ordinary course of its business. Its business, says plaintiff, was the making and selling of whole, finished cans. The sealing to effect completion must be accomplished at the canner's plant after the cans are packed (the closing process, considered as sealing the tops on the cans, being identical with the process of fixing the bottoms to the cans, a process accomplished at plaintiff's own plants with substantially identical machines). Thus, plaintiff argues, the machinery only constituted part of its manufacturing facilities which produced the product it sold—cans. As such, the gains from the sales of the closing equipment, termed "productive capital goods," (Pltf. Brief, p. 5) were, it contends, "separate from the main-stream of the enterprise," and therefore entitled to receive the "more lenient treatment" afforded to capital gains as distinguished from the ordinary income treatment accorded "profits and losses arising from the everyday operation of a business * * *." Recordak Corporation v. United States, 325 F.2d 460, 462, 163 Ct.Cl. 294, 298 (1963). The antitrust decree which, in effect, required the disposition of these capital assets, could not, it argues, serve to change the basic nature of the transaction, i. e., a disposition of machinery that had been used for many years only to manufacture cans and that had never theretofore been offered as an independent sales item.

The very nature of the machinery sales compelled by the decree demonstrates, plaintiff further argues, that the sales were not made in the "ordinary" course of business. Instead they consti-

2. On June 30, 1964, which was after the filing of the petition on April 16, 1964, the Commissioner of Internal Revenue mailed to plaintiff a notice of disallowance in full of its claim for refund.

3. The data upon which such computation was based takes the earliest acquisition date of any machine as 1920, although a substantial number of machines were in fact acquired before 1920. The average age is therefore actually greater than 16.6 years.

tuted, it contends, unusual and extraordinary transactions. This is so, it says, because (a) the decree fixed the sales price of the machines located at the lessees' plants, thus depriving Continental of control over the price at which its own property was to be liquidated; (b) such prices bore no relation to fair market value (and in fact generally were below such value, as well as below replacement cost) and therefore "had nothing to do with the ordinary course of commerce"[4] (Pltf. Brief, p. 11); (c) plaintiff was deprived of customer choice (lessees-in-possession were, as shown, given priorities for the purchase of the equipment they were leasing); (d) plaintiff was deprived of the right to determine what machinery it would sell (again on the basis that the lessee had the right to purchase the particular machine he was leasing); (e) plaintiff could not even fix the payment terms (since the decree required it to grant installment credit terms to purchasers); and (f) the interposition of the special master's supervisory actions constituted an interference with plaintiff's conduct of its own operations.

For the following reasons, these contentions of the plaintiff cannot be accepted:

 Where there is a change in the purpose of the holding of an asset, as there was here (as of January 1, 1951), the period of time prior to the date when such change took place, upon which plaintiff places such stress, is, even though lengthy as compared with the period of holding after such change-in-purpose date, not of importance in determining the "primarily" issue. The basic question is the primary purpose of holding as of the date of the sale. Recordak Corporation v. United States, supra; Nadalin v. United States, 364 F.2d 431, 176 Ct.Cl. 1032 (1966). And where a company is, at such date, regularly engaged in the dual business of selling and renting its machines, then income resulting from either activity satisfies the "primarily" concept, since it is "a part of" the "normal stream * * * of the taxpayer's business" and not "outside * * * [or] separate from the main-stream of the enterprise * * *." Recordak Corporation, supra, 325 F.2d at 462, 163 Ct.Cl. at 298. In the similar Recordak case, the taxpayer, for over twenty years prior to 1950, only rented its microfilming equipment. However, in that year "there was a change in operation," i. e., the taxpayer, in order to obtain working capital, "decided that as of July 31, 1950, it would sell as well as rent all of its stock of microfilmers" (325 F.2d at 460, 176 Ct. Cl. at 295), and this dual sale-or-rent business activity continued even after the taxpayer's need for working capital ended (in 1953). The continuance of the sales activity resulted from the introduction of a new model, the taxpayer thereafter deciding to dispose of the older equipment. This court rejected the taxpayer's claim to capital gains treatment for gains resulting from the sales of the older equipment. It held that such sales had, ever since 1950, formed "an accepted part of the taxpayer's regular business," and that "[i]f the purchasers are properly considered customers of that regular business, the taxpayer's dealings with them results in ordinary income." (325 F.2d at 462, 163 Ct.Cl. at 298). And, specifically addressing itself to the "primarily" question in the case of a sale-or-rent operation, the court stated:

> Nor can plaintiff succeed by hitching its wagon to the word "primarily." Whatever the precise scope of that troublesome term in other contexts,[5] it does not exclude from ordinary income the proceeds of sales by one, like plaintiff, who conducts a dual enterprise involving both rentals and sales

---

4. Since the machines involved had been held for such long periods of time, many had been fully depreciated. Consequently, even sales at the low decree price would produce gains

5. See Bernstein, Primarily for Sale: A Semantic Snare, 20 Stan.L.Rev. 1093 (1968).

of the same type of goods. In that setting, "primarily" invokes a contrast, not between selling and renting, but between selling in the ordinary course of business and selling outside of that normal course. * * * [T]he goods are held "primarily for sale to customers in the ordinary course of * * * trade or business" because they are regularly offered for sale to customers as part of the normal operation of the enterprise. No case of this kind has allowed capital gains treatment. [325 F.2d at 463, 163 Ct. Cl. at 300]

■■ Thus, with the exception of the "liquidation" cases, i. e., "where property has been sold [pursuant to an apparent businesslike activity] as a non-recurring final disposition of a holding or business" (*id.*), when the sales income regularly results from the day-to-day conduct of a continuing business operation, as is here the situation, it makes no difference that a substantial part of the gain from such sales may have resulted from an increase in value which accrued during the longtime holding period prior to the change in purpose which resulted in the establishment of the business. *Recordak Corporation, supra; Nadalin, supra.* Accordingly, if one decides to go into business using as inventory property held for a long period which has increased in value and which, in accordance with the original purpose of acquisition and the immediately following holding, would, upon disposition, have been entitled to capital gains treatment, the conversion of such holding purpose and the resulting dedication of the property to a business-in-ventory purpose also serve to convert the proceeds from the sales of the property from capital gains to ordinary income.

■ The attempt to cast these sales in the "liquidation" mold of cases must also be rejected. Of course, in a certain

sense, any sale, even of an ordinary item of inventory made in what everybody would agree was in the regular course of business, could be said to constitute the "liquidation" of an "investment," for a businessman certainly "invests" in his inventory. However, the essence of the true liquidation cases in this tax law area is, as above stated, "the final disposition of a holding or business," such as small sales resulting from the inability to dispose of inherited or investment property en bloc, or the winding up (due to a reorganization, insolvency, etc.) of a business operation or a phase thereof.[6] The situation here, however, is the direct antithesis. The sales herein involved were made as an incident to the commencement of a new business, to be conducted on a permanent basis, and not as an incident to the winding up of an old one. The sales of identical machines manufactured or acquired subsequent to January 1, 1951, are conceded to constitute ordinary income, as indeed are sales of pre-1951 machines made to anyone other than a lessee-in-possession as of January 1, 1951. Only these particular sales are carved out as allegedly being entitled to special treatment. It seems obvious, however, that all sales of the equipment made after January 1, 1951, to customers for use in their canning operations should be treated alike and as part of the new business activity entered into as of such date.

Similarly, it is not possible to accept the contention that the sales were not made in the "ordinary" course of business because of the various regulatory terms of the decree. It is true that this phase of plaintiff's business, conducted as it was pursuant to the terms of an antitrust decree, was, naturally, regulated and supervised. But from the beginning plaintiff fought divestiture and sought to remain in the closing-equipment business. Its stipulation to abide by the results of the American Can liti-

6. Cases illustrating these situations and allowing capital gains treatment are cited in Recordak Corporation v. United States, 325 F.2d 460, 463, 163 Ct.Cl. 294, 299 (1963), and Nadalin v. United States, 364 F.2d 431, 437, 176 Ct.Cl. 1032, 1043 (1966).

gation specifically excepted divestiture. It certainly knew that, if its activities were held to constitute transgressions of the Sherman and Clayton Acts, the conduct of this phase of its business operations, assuming it were permitted to remain therein at all, would necessarily, at least for a period of time, be required to be conducted pursuant to the terms of a decree. And when, after such illegality was established, American Can offered to make its machines available for sale as well as for rent, and, in connection therewith, to engage in a vigorous sales program, and thereby persuaded the district court not to order the divestiture for which the Antitrust Division was pressing, plaintiff accepted the same terms. It collaborated with the Government attorneys in fashioning the decree under which it would operate, including superintendence by the same special master who would supervise American Can's activities. For plaintiff, therefore, this newly established equipment sales portion of its overall business operations, conducted in accordance with the decree terms, would necessarily become its "ordinary" business. Plaintiff knew that the sale of the equipment to lessees-in-possession as of January 1, 1951, was one of the principal purposes of the new business upon which it was embarking. Many businesses are, for various reasons, subject to forms of regulation. This does not, however, make their everyday conduct in accordance therewith anything other than "ordinary," even though, despite their owners' deliberate choice to engage in such a regulated business, they might well prefer to conduct their business activities free of regulatory restriction.

Indeed, when this same contention was presented to the Second Circuit by American Can in its case involving the identical income tax issue as is here involved, the court considered the entire question of the reason why the taxpayer conducted this portion of the business as it did to be immaterial:

> But the taxpayer would have us read I.R.C. 1939, § 117(j) (1) (B) to require an ascertainment of its subjective intent. It argues that, since it was the compulsion of the antitrust decree, and not business policy, that resulted in the closing equipment being held for sale, capital gains treatment is warranted. We feel the Commissioner is on sounder ground in contending for an objective approach. Irrespective of motive or cause, the fact remains that in 1953 the taxpayer held the machines for sale as part of its ordinary trade or business. * * *
>
> * * * The fact of its subjective preference for its former—now illegal—manner of operation is singularly immaterial here. * * * [American Can Company v. C.I.R., supra, 317 F.2d at 605–606]

The court went on to hold that plaintiff's position was not sustainable in any event because of its insistence on conducting this phase of its business under the terms of the decree:

> We hold note further that had the taxpayer been willing to divest itself of this line of its business, as was urged by the Antitrust Division, it would then have been entitled to capital gains treatment without question. Instead, the taxpayer chose, as the better of undesirable alternatives, to enter a new business: the sale, as well as the rental, of closing equipment. Thus, even looking to the motive or cause of the machines being held for sale, we cannot hold for the taxpayer. * * * [Id. at 606]

As indicated, it is only sales of pre-1951 machines to lessees-in-possession as of January 1, 1951, that plaintiff selects for special treatment. Plaintiff concedes that all other sales it made under its new sales program constitute ordinary income, and this would include even sales of pre-1951 machines provided they were not made to lessees-in-possession. It is plain, however, that these lessee-in-possession sales constituted only one segment of its newly adopted overall sales program. Pursuant thereto, and in accord-

ance with the decree, plaintiff engaged in a comprehensive advertising program intended to inform its container customers who were then renting its machines that the machines were now available for sale at advantageous prices and terms. Plaintiff's regular container sales organization was given the added responsibility of vigorously attempting to sell the machines to lessees and other prospective purchasers. Through these efforts over the five-year period 1951–1955 plaintiff was able to sell approximately thirteen million dollars in machinery to lessees-in-possession as of January 1, 1951 (upon which approximately five million dollars in net gains was realized).

That the decree-regulated prices of the pre-1951 machines at which lessees-in-possession were privileged to purchase were much lower than the prices of the identical machines manufactured after January 1, 1951, is again only another of the conditions upon which plaintiff, knowing that it had been in violation of the antitrust laws and that the decree was intended to compensate for the illegal activity that had been engaged in, chose to enter this new business.[7] It is not surprising that, in prescribing formulae for maximum sale prices of the pre-1951 machines, the court obviously took into consideration the fact that the plaintiff's customers had been paying for the machinery during the previous years through their "tie-in" purchase of cans. For this reason and in the setting herein involved, the fair market value, replacement and manufacturing costs, and the fact that, as an abstract proposition, the maximum formulae selling prices of the machines were less than such value and costs, are irrelevant.

Furthermore, it is also obvious that the court concluded that those who had been paying for the machines over the years should be given priority to purchase them.[8]

Plaintiff distinguishes *American Can* on the grounds that that litigation covered not only pre-decree but also post-decree machinery, the treatment of which as ordinary income plaintiff does not contest, although American Can did. This distinction is hardly meaningful. Insofar as the decision did cover pre-decree machines, it is, clearly, directly in point. The pre-decree machines were not an insignificant nor unnoticed segment of the litigation, the court specifically observing that "[m]ost of the machines sold during the taxable year [there in question] were manufactured before the antitrust decree * *. *." (*Id.* at 605)

Further minimizing *American Can* as authority, plaintiff points out that the court there, after reviewing the "impressive" number of machine sales the company made, and the intensity of its sales efforts, concluded that "[b]eyond question, American Can Company had a substantial purpose to sell its closing equipment." (*Id.* at 605) Plaintiff correctly points out, however, that in using such "substantial purpose" language, the court relied on a construction of the statutory clause "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" as meaning that a purpose may be "primary" if it is only "substantial," a doctrine which the Supreme Court rejected in Malat v. Riddell, *supra*. However although the Supreme Court in *Malat* specifically cited (383 U.S. n. 3, p. 571, 86 S.Ct. p. 1032) *American Can*

7. Plaintiff refers to the prices of the machines in question being "fixed" by the antitrust judgment or decree. However, the decree contained no set prices so "fixed." The judgment provided a formula for a maximum "base" price, *i. e.*, ten times 1950 rental, only provided, however, that the price resulting from such formula exceeded the "weighted average depreciated cost." If not, then such cost became the maximum price, provided it did not exceed the "current factory cost."

8. Although the decree required plaintiff to sell the machinery on credit if the lessee so desired, it also allowed plaintiff to require proof of satisfactory credit. There would appear to be nothing extraordinary about these provisions.

as one of the cases which had so erroneously interpreted "primarily," it in no way intimated that *American Can* had been wrongly decided, i. e., that any different result would follow from the application of the proper test. *Malat* itself was an altogether different kind of case. It did not involve a taxpayer in two separate businesses, such as is plaintiff. There the taxpayer purchased and subsequently sold a parcel of land upon which it claimed capital gains treatment. The denial of such treatment resulted from a dispute between the taxpayer and the Internal Revenue Service as to the intended use of the parcel, the taxpayer claiming a purpose to hold and develop for a rental apartment project, and the Internal Revenue Service contending that the taxpayer had purchased and held the property either for such rental purpose or for the purpose of selling it, whichever turned out to be more profitable, and that since such possible sale constituted a "substantial" purpose of the holding, ordinary income treatment was justified. The district court had agreed with the Internal Revenue Service and the Ninth Circuit affirmed. The Supreme Court, however, held that " 'primarily' means 'of first importance' or 'principally' " and, without intimating "whether the result would be supportable on the facts of this case had the correct [legal standard] been applied," remanded the case to the district court for such application. (*Id.* at 572, 86 S.Ct. at 1032)

As shown above, this court, in *Recordak Corporation*, in a setting of a two business selling-or-renting case, concluded that "primarily" only "invokes a contrast, not between selling and renting, but between selling in the ordinary course of business and selling outside of that normal course," and that, in such a case, "the goods are held 'primarily for sale to customers in the ordinary course of * * * trade or business' because they are regularly offered for sale to customers as part of the normal operation of the enterprise." (325 F.2d at 463, 163 Ct.Cl. at 300) Certainly here plaintiff, on a continuous day-to-day

basis, and over the years, "regularly offered for sale to customers" the machines in question. Indeed, in *Recordak Corporation*, the court felt that the result in the "very close" (*id.*) two business sale-or-rent case of *American Can* (conformed with the "primarily" test it was applying in *Recordak* and was proper. The Supreme Court, in noting, as aforesaid, the various interpretations that had been given to "primarily," including that in *American Can*, also noted (in the form of a "*Cf.*" following its citation of *American Can*) the *Recordak Corporation* decision without in any way intimating that the *Recordak Corporation* test was, in such type of two-business case, erroneous. Nor does plaintiff criticize *Recordak Corporation* in any manner. Instead, it merely contends that under the facts, the sales of the pre-1951 machines to the lessees-in-possession do not fall within the *Recordak* "mainstream" test. However, for the reasons set forth, the conclusion is compelled that they do.

And, just as the ordinary income result in the two business rent-or-sell *Recordak Corporation* situation is consistent with the "primarily" doctrine of *Malat*, so, as this court specifically held in Nadalin v. United States, *supra*, is there nothing inconsistent with *Malat* in the doctrine that ordinary income results from a change in the purpose of holding pursuant to which the property becomes devoted to a business purpose despite a long prior holding of a type that would have given rise to capital gains had such holding purpose persisted.

Finally, there surely is no merit to the contention that the sales in question were outside the "mainstream" of plaintiff's business because such business should be considered as one of selling completed, sealed cans, the closing equipment thus in effect constituting but a part of the total manufacturing process and therefore to be properly classified as productive capital assets. Plaintiff never conducted its business operations in that manner. It always conducted the sealing operation as a separate business by charging rent for the closing equipment.

Thus additional income traditionally resulted from this phase of its operations (although it is true that prior to the decree, plaintiff looked to the sale of its containers for a complete recovery of cost and a realization of its profit on both the sale of the containers as well as the rental of the equipment).[9] A manufacturer selling a completed product normally does not make a separate charge for an integral step in the productive process. Instead, all manufacturing costs are normally covered in the price of the completed product. All that happened here is that plaintiff's separate leasing business was expanded to a sale-or-rent business. Income from the sale of the machines was thus certainly in the "mainstream" of the closing equipment business that plaintiff had always conducted. Unless this portion of its operations had the status of a separate business, and not merely a step in the alleged basic manufacturing process of producing completed cans, there would have been no point in everyone, including plaintiff, treating it as a separate activity subject to and capable of divestiture.

In view of all of the above considerations, plaintiff is not entitled to recover on this aspect of the case.

## THE ALTERNATIVE EXCESS PROFITS TAX ISSUE

The determination by the Internal Revenue Service that the gains resulting from the sales of the closing equipment constituted ordinary income also had the effect of subjecting such gains to excess profits taxes under the Excess Profits Tax Act of 1950 (§§ 430–474, Internal Revenue Code of 1939). That Act was not applicable to gains from sales or exchanges of capital assets. (§ 433(a) (1) (C))

■ Plaintiff contends, however, that even if the gains herein involved are properly to be treated as ordinary income and therefore subject to the excess profits tax, they nevertheless constitute "abnormal income" within the meaning of section 456 of the 1939 Code, thus entitling plaintiff to the relief afforded by such section. Under this section the excess profits tax for a year in which such abnormal income is realized is computed by allocating a portion of such income to other years, *i. e.*, the previous or future years to which the income is attributable.[10] If such portions are al-

9. Under the decree, which abolished the "tie-in" between the purchase of the cans and the leasing of the machines, plaintiff was required to cease charging only nominal rental amounts for the use of its machines and to establish realistic rental prices.

10. Section 456 reads in pertinent part as follows:

SEC. 456. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) Definitions.—For the purposes of this section—

(1) Abnormal income.—The term "abnormal income" means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class

includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) Separate classes of income.—Each of the following subparagraphs shall be held to describe a separate class of income:

(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; or

(C) Income from the sale of patents, formulae, or processes, or any combination of the foregoing, devel-

locable to years not subject to excess profits tax, the relief will, of course, be substantial. And even if the other years were excess profits tax years, benefits will accrue because excess profits credits will become applicable for more than one year.

Included in the statutory classifications of income defined as "abnormal income" is "Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing;" (§ 456(a) (2) (A)). Plaintiff contends that the gains from the sales of the closing equipment

fall within this classification since they "resulted from the fact of the antitrust decree." That decree, says plaintiff, by "terminating Continental's policy of leasing closing equipment" and "forcing" the sales which resulted in the gains, was their producing cause. These gains therefore constitute, it contends, "income arising out of a * * * decree" within the meaning of section 456(a) (2) (A).[11]

Further, there is agreement that under section 456(b)[12] and the pertinent regulations,[13] the abnormal income must

oped over a period of more than 12 months; or

(D) Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's method of accounting.

\* \* \* \* \*

(3) Net abnormal income.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Secretary, (A) 115 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year, as the excess of the amount of such abnormal income over 115 per centum of such average amount bears to the amount of such abnormal income.

(b) Amount Attributable to Other Years.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributable to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income for a previous taxable year.

(c) Computation of Tax for Current Year.—The tax under this subchapter for

the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, * * *.

This section was in effect only with respect to taxable years ending after June 30, 1950, and beginning before January 1, 1954. Section 430(a), Internal Revenue Code of 1939, as amended.

11. Pltf. Brief, p. 18.

12. See n. 10.

13. Treasury Regulations 130 (1939 Code) provides:

"Sec. 40.456–3 Amount attributable to other years. (a) The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

"(b) Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of such factors as high prices, low operating costs, increased demand, or decreased competition, such items shall not be attributed to other taxable years. Thus, no por-

meet the additional requirement that it be attributable to other years. Plaintiff says the gain herein involved meets this requirement too because "such gain represents rental income Continental would have realized over a period of years had it not been for the effect of the antitrust decree." This conclusion is supported, plaintiff argues, by the fact that one of the formulae adopted by the decree to arrive at the "maximum base" price of the closing equipment herein involved is ten times 1950 rental. Thus, says plaintiff, the effect of the decree was to take rental income that would have accrued to plaintiff over ten years and condense it all into the one year of the sale. Such income is accordingly claimed as properly attributable to the ten-year period 1951–1961 and, therefore, allocable to such years. Plaintiff emphasizes [14] the language of Regulations 130, section 40.456–3(b) providing that "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin * * * " [15] (the "origin" of the "events" herein involved being, presumably, the antitrust decree).

These alternative contentions are not acceptable. In a sense, the gain plaintiff realized could, of course, be said to result *"from the fact* of the antitrust decree." [Emphasis supplied] In this sense, however, it could be said to have been realized from many "facts," *i. e.,* the "fact" of its corporate existence, or the "fact" that it was in the container business in the first place, or the "fact" that it had indulged in illegal activities prior to the decree. Clearly, however, this is not the sense in which the statute exempts "income arising out of a claim, award, judgment, or decree." It seems plain that what is here referred to is moneys flowing from some kind of affirmative assertion of claim by the taxpayer, a claim that may have been successfully prosecuted and thus have taken the form of an "award," a "judgment," or a "decree," all of which are common terms used to describe the final actions of judicial or quasi-judicial bodies in determining, after adjudicating a dispute, that a claimant is entitled to a certain sum of money. "Judgment" is, of course, the common term applicable to the final action of courts in proceedings to enforce rights and to determine amounts due. In certain actions, especially those of an equitable nature, or those determined by admiralty or probate courts, the final determination, including the requirement that a certain amount be paid by one party to another, may take the form of a "decree." See National Surety Co. v. Mulligan, 105 N.J.L. 336, 146 A. 372 (1929) (involving a judgment type of decree of a surrogate's court requiring the payment of a

---

14. Pltf. Brief, p. 21.

tion of an item is to be attributed to other years if such item is of a class of income which is in excess of 115 percent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income."

15. See n. 13. As set forth in n. 10, § 456 (a) (1) provides that it must either be abnormal for the taxpayer to derive income of the particular class, or if the taxpayer normally derives income of such class, the amount of such income for the taxable year must be in excess of 115 percent of the average amount of the gross income of the same class for the four previous taxable years. In its normal course of business Continental has received income arising out of claims, awards, judgments, or decrees. Assuming the gain herein involved properly falls within such class, there is no dispute between the parties that the amount thereof received in 1951 is sufficiently in excess of income of the same class received by Continental in the four previous years to meet this 115 percent requirement.

certain sum by one party to another). An example of a decree under which monetary damages may be awarded is that which may be rendered in a patent infringement suit. "A patent owner ordinarily has his election to sue at law charging infringement and demanding damages, or he may seek an injunction, accounting and damages in equity." Ryan Distributing Corporation v. Caley, 51 F.Supp. 377, 379 (E.D.Pa.1943), aff'd 147 F.2d 138 (3d Cir. 1945), cert. denied, 325 U.S. 859, 65 S.Ct. 1199, 89 L.Ed. 1979.[16] These determinations are also, of course, frequently denominated "awards," and such "award" language is also commonly used in connection with arbitration proceedings. Thus, all the "claim, award, judgment, or decree" language involves terms customarily associated with an affirmative assertion of moneys due (a "claim") and some formal determination thereof (an "award, judgment, or decree"). It seems plain that this was what the provisions herein involved, being addressed to "abnormal income" and income "attributable to other years," meant, for it might, for instance, take many years to establish a claim based upon past events or contracts, and it was obviously felt that it would not be fair to throw the recovery into income subject to the excess profits tax if the litigation happened to be concluded in a year in which such a tax was in effect. See Bell Aircraft Corporation, 32 T.C. 355 (1959) (Court of Claims judgment allowing a recovery with respect to expenditures made in the performance in prior years of cost-plus-fixed-fee contracts held to constitute "income arising out of a * * * judgment," and which income was "attributable to other years"). Accordingly, "judgment" or "decree," in the "claim, award, judgment, or decree" context could hardly encompass an antitrust "Final Judgment" such as is here involved, which had no purpose of adjudicating any monetary

claim or demand that plaintiff was pressing but which instead "Ordered, Adjudged and Decreed" that plaintiff, as a defendant, cease its illegal practices and required it to make its closing equipment available for sale as well as for rent. The statutory classifications of "income" which are to be treated as "abnormal income"[17] in no way evidence an intention to convert "ordinary income" to "abnormal income" simply because the change in holding purpose which led to the establishment of the new "trade or business" came about in order to be in compliance with an antitrust judgment or decree.

In Yuba Gardens, Inc., 17 T.C. 334 (1951), moneys received by the taxpayer in the ordinary course of business were likewise refused "abnormal income" status since they were not received pursuant to a "claim" within the meaning of a similar excess profits tax act. There the taxpayer sold parcels of land under contracts which required payments to be made over the succeeding ten years. During the taxable year in question the taxpayer received, in addition to the regular installments, delinquent as well as accelerated payments. Because of the requirement that all of the unusually large amount of receipts be included in the taxpayer's gross income in the year of receipt, it sought to have the payments considered as abnormal income arising out of a "claim" pursuant to the provisions of the predecessor of section 456. The Tax Court, however, denied the requested relief under the excess profits tax law, stating:

> * * * Although it does not seem that Congress intended to restrict the meaning of the term "claim" to technical items such as litigated claims, it does appear that something more than an existing right is necessary to come within the intendment of the statute. *Since the term is used in connection with "award, judgment, or decree," it*

---

16. In Treas.Reg. 130, § 40.456–6(b), a recovery in a patent infringement suit is cited as a possible subject for relief under the abnormal income provisions.

17. See n. 10.

*appears that at the least the statute requires that there be a bona fide dispute or an asserted demand.* [Emphasis supplied] (at 343)

Even as to the delinquent payments, the court noted that the taxpayer had never made any demands to enforce its contract rights but simply permitted the purchasers to make payments as they could.

Neither of the two cases plaintiff cites, *Bell Aircraft Corporation, supra,* and Triboro Coach Corporation, 29 T.C. 1274 (1958), in both of which "abnormal income" status was accorded the amounts in dispute, supports its position that an antitrust "judgment" or "decree" such as is here involved would fall within the terms of the section. Both cases involved money recoveries as a result of affirmative claims asserted and pressed by the taxpayer, *Bell Aircraft* involving, as stated, moneys received under a Court of Claims judgment, and *Triboro Coach* involving moneys ultimately received as a result of a dispute between a bus operator-taxpayer and New York City over the amount of a service charge to be allowed the bus company for the performance in prior years of certain functions (printing, selling, collecting and accounting) in connection with "combination" rides on the taxpayer's and the city's lines. In *Triboro Coach,* the Tax Court held the amounts so received by the taxpayer to constitute income "arising out of a claim," stating:

> It is clear from the testimony that Triboro was pressing a request for an increased allowance for the performance of the functions for which the service charge was provided. * * * There was *at least a dispute or an asserted demand* sufficient to constitute a "claim." [Emphasis supplied] (at 1280)

Similar "abnormal income" was recovered by the taxpayer who pressed "asserted demands" in American Enka Corporation, 30 T.C. 684 (1958) (recovery of interest on tax over-assessments).

All of these cases illustrate what clearly appears to be the common understanding of "income arising out of a claim, award, judgment, or decree," and support the conclusion that plaintiff's income arising out of sales of pre-1951 container-closing equipment to lessees-in-possession, made in compliance with the antitrust decree, does not qualify for relief under section 456.[18]

■ Additionally, even if plaintiff's interpretation of the "decree" provision be considered proper, so that the gain herein involved could be treated as "abnormal income," it seems plain that the gain nevertheless does not meet the "attributable to other years" requirement. The ground upon which plaintiff relies, *i. e.,* that the antitrust judgment provided that the maximum "base" price of the pre-1951 machinery located at the lessee-canners' plants should be ten times the 1950 rental, so that the gains therefore are properly attributable to the ten-year period 1951–1961, is not persuasive. The conversion into a lawful sales price of what would, under the old, illegal, system, have been rental income for ten future years could hardly be considered as producing; as a result of the sale, income "attributable" to such years. In the first place, when an article may be either rented or purchased, it would not seem unusual to have the sales price and the rental fee bear some kind of a ratio relationship. However, this does not make, in any real sense, the income from the sale any the less "attributable" only to the year of the sale, for both the sales price and the rental fee obviously stand on their own feet. Such sales income

---

18. The comparison of the 1951 gain here involved with the "income arising out of claims, awards, judgments, or decrees" which plaintiff realized during the years 1947 through 1950, which comparison is set forth in the record as proof of eligibility under the 115 percent provision of sec. 456(a) (3) (see n. 10), also shows that such 1947–1950 income was of such affirmative-claim-money type which plaintiff had asserted, *i. e.,* "State & Local Tax Refund and Interest," "Bad Debt Recoveries," and "Other claims (freight.)" (Finding 51)

could hardly be considered as attributable to the years which would hypothetically have produced rental income had the sales not been effected. It seems quite clear that what was intended to be covered were situations permitting more definite and precise "other year" income attributions, such as, for instance, the *Bell Aircraft* situation, where moneys due under completed contracts were not received until protracted litigation finally produced them in a later, but excess profits, tax year. In all of the above-cited cases allowing "abnormal income" relief, the attribution of the income to other years was based on some such similar factor. Secondly, in this particular instance it is all the more difficult to regard the sales price as "attributable" to the rental income which would have been produced over a ten-year period when it would have been illegal for plaintiff to have continued to rent the equipment during 1951–1960 on the old 1950 rental basis and method of doing business.[19]

For all of the reasons hereinabove set forth it is concluded that plaintiff is not entitled to recover.

SKELTON, Judge (dissenting):

I respectfully dissent.

The only property involved is the can closing equipment which the plaintiff had been leasing to its customers for 16.6 years on the average and in some cases for thirty years.

The only problem involved is whether this equipment constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

In my opinion, this property was not only *not* held "primarily" for sale to its customers, but was not held for sale at all. Furthermore, when taxpayer was forced to convey the equipment to its lessees by the court decree, this was not done in the ordinary course of business but in a most extraordinary way.

The courts have uniformly held where this problem has arisen that it must be solved by the facts in each particular case and that there is no formula or rule of thumb test that can be applied to all cases. For this reason, this case must be considered in the light of its peculiar facts that are not to be found in any other case.

We start with the Supreme Court's definition of the word "primarily" in the case of Malat v. Commissioner of Internal Revenue, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), where the court said:

> * * * We hold that, as used in § 1221(1) [Sec. 117(j) of the Internal Revenue Code of 1939] "primarily" means "of first importance" or "principally." [*Id.* at 572, 86 S.Ct. at 1032.]

This definition in effect overruled American Can Co. v. Commissioner, 317 F.2d 604 (2d Cir. 1963), cert. denied, 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 479 (1964), which the Supreme Court referred to in footnote 3, page 571, 86 S.Ct. 1030, as being one of the cases where there was a conflict over the

---

19. As shown in n. 7, the ten times 1950 rental maximum sales price formula was not the exclusive method under the decree for the establishment of the sales price. If such price was less than the "weighted average depreciated cost," such cost became the "base" price. This price, however, could not exceed the "current factory cost" of the type and model involved on the effective date of the decree. Furthermore, the equipment covered by the decree embraced not only the closing machine itself but certain "related equipment" and "auxiliary equipment," and in the case of such equipment, the decree simply required "reasonable, uniform and nondiscriminatory" sales prices if Continental had no established rental rate therefor in effect for the calendar year 1950. Thus, there is no showing that all of the sales receipts herein involved represent the "ten times 1950 rental" formula. Such "related equipment" is used in various ways incident to the closing operation, including the preparation, filling, or weighing of the contents of the can prior to final seaming. Similarly, the "auxiliary equipment" consists of such mechanisms as nonspill devices.

meaning of the word "primarily." It will be noted that in *American Can* the court had said that "primarily" meant "substantial" instead of "principal." The majority relies heavily on *American Can* in this case, but obviously its reliance thereon is misplaced because the decision of the Supreme Court in the *Malat* case has effectively negatived its standing as an authority in this field. Moreover, *American Can* is clearly distinguishable on the facts from the instant case. There, the taxpayer evidently repossessed or reclaimed its leased machines from its lessees and put them in its inventory or stock of merchandise held for sale, although this is not made clear by the opinion. However, we can assume this is what happened because it is clear that after the decree of 1950, it sold all machines, both those previously leased as well as new ones manufactured after the decree, to the general public indiscriminately during the years 1951, 1952, and 1953. It then claimed it was entitled to capital gains treatment for *all* machines (both old and new) sold by it in 1953 only. As is evident, 1953 is a taxable year more than three years after the decree was entered, and during these three years it sold *all* machines to *all* people and then claimed the exemption on *all* sales These facts are not present in our case. Consequently, *American Can* does not control our case either on the facts or on the law.

In the *Malat* case, the Supreme Court also mentioned Recordak Corporation v. United States, 325 F.2d 460, 163 Ct.Cl. 294 (1963), which the majority relies on, with a *cf.* reference to it in the same footnote described above in which it listed *American Can.* In other words, it was listed among the cases where a conflict existed as to the meaning of the word "primarily." The majority says that the Supreme Court did not intimate that *Recordak Corporation* was erroneous. I disagree at least as to the meaning of the word "primarily," because otherwise there would have been no reason to list it with *American Can* and the other cases that had erroneously

defined "primarily" in the Code. This is made doubly apparent by a reading of the opinion in *Recordak Corporation* in which this court said in defining "primarily";

> * * * [G]oods are held "primarily for sale to customers in the ordinary course of * * * trade or business" because they are regularly offered for sale to customers as part of the normal operation of the enterprise. * * * [*Id.* 325 F.2d at 463, 163 Ct. Cl. at 300.]

In my opinion, this statement does not meet the requirements of the Supreme Court's definition. The word "regularly" has about the same meaning as "substantially" which was erroneously used in *American Can* to define "primarily." Goods could be "regularly" offered for sale without being "principally" offered for sale and without sale being the object of "first importance" in the offering. They could be offered "principally" for lease and with rentals being of "first importance," even though "regularly" offered for sale. In such case, under the Supreme Court's definition, the goods would not be held "primarily" for sale, and any gain by the taxpayer on their sale would be long term capital gain under Section 117(j) of the Code.

In any event, the *Recordak Corporation* case does not require a decision against the taxpayer in our case as a matter of law, nor even as a compelling precedent. We do not have to overrule that decision in order to hold for the taxpayer here. That case, in addition to the foregoing, is clearly distinguishable from the instant case on the facts. There, the taxpayer had been freely and voluntarily disposing of its microfilm machines either by rental or by sales to anyone wishing to acquire them for over four years prior to the tax years in question. The machines were in its possession and inventory as the main part, if not the only part, of its stock of merchandise. When a new model came out, it decided to dispose of the old machines. This was accomplished by selling what it could and

discarding the rest as junk. It claimed capital gains treatment for the equipment thus disposed of, which was correctly denied. It was never intended that capital gains treatment would be given to transactions of that kind. Otherwise, every time a new model automobile or appliance came out, the dealer could dispose of his old models and claim capital gains treatment for any profit made.

The facts in our case are vastly different. Here, the taxpayer had been leasing the machines for over thirty years (their average age was more than 16.6 years). It had never sold nor offered to sell any of these machines during this entire period. At the time of the decree in the antitrust suit, the machines were not even in its possession but were in the hands of the lessees who had the right to such possession under the terms of the leases. Consequently, they were not a part of its inventory nor stock of merchandise on hand and they could not have been offered for sale to the general public prior to the decree because of the lease contracts. It should be remembered that we are only considering the leased machines (and not machines in general) because they are the only ones involved here. Under these circumstances, everyone will agree that up to the time of the decree, the taxpayer did not hold these machines "primarily for sale to customers in the ordinary course of his trade or business." In fact, it made no sales and refused to make them. As far as these machines were concerned, it was in the leasing and rental business exclusively.

The defendant says in its brief (page 11) that " * * * whether goods are being held primarily for sale in the ordinary course of business depends * * * upon conditions *at the time of sale.*" [Emphasis supplied.] I do not agree. This argument would require us to shut our eyes to the purpose for which the machines were acquired and the purpose for which they were held and used during the 30 years they were leased, and would require us to look only to the fact that they were sold as proof they were being held primarily for sale. The same argument could be made if the taxpayer was forced to make the sales at gun point, but no court would hold that sales under such circumstances would be proof that the goods were being held primarily for sale. The situation before us is not materially different, especially when the end result is considered. Here the taxpayer was forced to sell these machines at "legal gun point" (the decree), when it did not want to do so. It had no choice as to whom the machines would be sold, nor the price to be obtained for them nor the terms of sale. The decree took care of all of these matters and forced the taxpayer to comply with its dictates. Yet, the government would have us consider only the fact that sales were made "at the time of sale," and asks us to hold that the sales made under these circumstances were made in the normal course of business as ordinary sales. They could not have been more extraordinary unless physical force had been used. There was nothing normal about them.

This "at the time of sale" argument was answered by the court in Philber Equipment Corp. v. Commissioner of Internal Revenue, 237 F.2d 129 (3d Cir. 1956). There the taxpayer was in the business of renting motor vehicles (trucks, tractors and trailers) to the public. Most of the leases were for one year. When the vehicles were returned at the end of the leases, they were not worn out but still had a lot of useful life left in them. The taxpayer sold them and claimed long term capital gain. The Commissioner rejected the claim and said that only ordinary gain applied because the vehicles were acquired for the dual purpose of leasing and selling, and, therefore, they were held primarily for sale. This was upheld by the Tax Court. However, the Circuit Court of Appeals reversed this decision and held for the taxpayer. It said that:

> * * * [T]he determinative factor is the purpose for which the property was held at the time of its acquisition and during the period of its use. * * * [*Id.* at 131.]

The court also said that the sale, standing alone "cannot be considered inconsistent with the conduct of a rental business or make the sale factor a dominating business purpose of [the] taxpayer." [*Id.* at 132.] The court held that notwithstanding the sales, the "primary business purpose was vehicle rental." In that case, the same "at the time of sale" argument was made as in the instant case, which was upheld by the Tax Court but rejected by the Court of Appeals when it said:

The Tax Court, as an alternative ground, stated that even if the intention to sell had been absent at the time of the original acquisition, such intention did exist at the time of re-possession from the lessee, and the determining factor is then the purpose for which the property was being held at the time of sale rather than the purpose for which it was originally acquired and held.

We cannot subscribe to this "alternative ground". To do so would make for judicial nullification of Section 117(j).

The essence of the Tax Court's alternative ground is that property changes character merely by the fact of its being exposed for sale. We agree with the taxpayer that such a concept is neither logical nor reasonable. [*Id.* at 132–133.]

In my opinion, the conditions that existed at the time of the decree are more important than those which existed at the time of the sale. For all practical purposes, the sales were required and arranged for at the time the decree was entered. At that time, the taxpayer was required to sell the leased machines to the lessees who had possession of them for the prices and on the terms specified in the decree. All that remained to be done were the purely routine and perfunctory acts of transferring title. As far as the taxpayer was concerned, the sales were made by the decree at the time it was entered. No one—not even the Commissioner of Internal Revenue with his ever changing ability to be fluid in problems of this kind [1]—could contend that the machines were being held primarily for sale at the time the decree was entered.

The majority opinion stresses the point many times that the taxpayer entered into a *new* business on January 1, 1951, after the decree had been entered on June 26, 1950, which had a dual purpose of leasing and selling the same kind of machines that are involved in this case. This is true but the *new* business had nothing to do with the *old* business of leasing the machines which were already committed to be disposed of under the decree before any new business was started. The machines leased under the old business which were sold to the lessees under the decree, were never repossessed, never put into stock, never became a part of taxpayer's merchandise inventory, and never offered to anyone for sale except to the lessees, who had possession of the machines, after the decree was entered. They never became a part of the new business, but were disposed of when the old business was closed out by the decree. There was a forced divestiture of the leased machines by the order of the court and this divestiture became binding when the decree was entered.

There have been many cases where property has been acquired and held for the dominant purpose of rental or for some other dominant purpose, not including sale, and when the property was finally sold, the fact that a sale was made did not deprive the taxpayer of capital gains treatment under Section 117(j). For instance, in the case of Delsing v. United States, 186 F.2d 59 (5th Cir. 1951), the taxpayer was in the business of building and selling homes. He built 45 rental houses under Federal Housing Administration regulations in which he agreed to construct them for rent. The

---

1. See Dunlap v. Oldham Lumber Co., 178 F.2d 781 (5th Cir. 1950), where the

Commissioner took a position different to that taken by him in the instant case.

tenants were given the right to buy the houses after a stated period of time on specified terms. Before building the houses, he wrote a letter to the FHA saying "these houses are to be built for sale or rent." The houses were rented for three years and were then sold to the tenants. The taxpayer claimed capital gains treatment, which was denied by the IRS, which contended that the houses were held primarily for sale as shown by the letter and because they were sold. The court held for the taxpayer, saying the houses were capital assets and were not held primarily for sale in the ordinary course of taxpayer's business. It would appear that the instant case is stronger for the taxpayer than the cited case.

In the case of Dunlap v. Oldham Lumber Co., *supra.*, N.1, the taxpayer was in the lumber business. It bought fifty vacant lots in a subdivision in 1928 with the unrealized expectation that they would be taken into the city limits and public utilities made available. It had hoped to sell lumber to build homes to individuals who would purchase the lots. It sold a few lots from time to time. During one five-year period it sold only one or two lots. Finally, it sold 27 of the lots in 1944 and the remainder in 1945 at a loss. It claimed an ordinary loss on its income tax returns, but this was denied by the Commissioner who held that the lots were capital assets and were not held primarily for sale and the loss was a capital loss and not an ordinary loss. (It will be noted that the Commissioner took exactly the opposite position there than he is taking in the instant case.) The court held:

> * * * The conclusion is inescapable that the sale of the lots was most *extraordinary and not at all ordinary,* and there was no ordinary course of business as to lot sales. By the express terms of the statute property must not only have been "held primarily for sale," but also for sale in the "ordinary course of the business of the taxpayer." * * *

> We conclude, therefore, that * * * the lots in question were capital assets, * * *. [Emphasis supplied.] [*Id.* at 785.]

It is significant that in that case the taxpayer intended to eventually sell the lots at the very time it purchased them and actually did sell them in the end. However, the Commissioner paid no attention to these facts and contended the taxpayer did not hold the lots primarily for sale. Yet, in the instant case the Commissioner says that because there were sales, the machines were held primarily for sale. Of course, in that case, the Commissioner was trying to prevent the taxpayer from taking an ordinary loss while here he is attempting to prevent the taxpayer from receiving capital gains. It is amazing how agile he can be in shifting positions when to do so is against the taxpayer and in favor of the government.

The case of United States v. Bennett, 186 F.2d 407 (5th Cir. 1951) is in point.[2] There, the taxpayer was in the business of breeding cattle to sell the calves and these sales constituted the main source of his income. In addition, however, when cows or bulls were no longer useful for breeding purposes, he would cull them out of the herd and sell them. His business was a continuing one. He claimed capital gains on the sale of these culls, but the Commissioner contended that the taxpayer intended to eventually sell every calf born, either as a calf or later on as a cull, and, therefore, all of the cattle were held primarily for sale. The court ruled in favor of the taxpayer and upheld his contention that the cattle were kept primarily as breeders and not for sale and that their sale when they were no longer useful as breeders was purely a secondary or incidental use. In so holding, the court said:

> If the statute had been intended to mean what the collector contends for,

2. See also Davidson v. Tomlinson, 165 F.Supp. 455 (S.D.Fla.1958).

the word "primarily" would not have been in it. Since "primarily" is in the statute, it seems clear to us that to hold, as the collector contends, that the main, the first, purpose of the keeping of these breeder cattle was for sale, does complete violence to the statute and to its purpose and intent.

The construction contended for by the taxpayers seems the more reasonable to us. It has the support of the Albright v. United States, 8 Cir., 173 F.2d 339, and of two tax cases, Emerson v. Commissioner of Internal Revenue, 12 T.C. 875; Fawn Lake Ranch Co. v. Commissioner of Internal Revenue, 12 T.C. 1139; and in principle of Delsing v. United States, 5 Cir., 1951, 186 F.2d 59. [*Id.* at 411.]

The principal factor that is determinative of whether property is held primarily for sale, according to the cases where the problem has arisen, seems to be the purpose for which it was acquired and held during the period of its use. The fact that it is finally sold is not the dominating nor controlling factor. This was aptly stated by the court in Philber Equipment Corp. v. Commissioner of Internal Revenue, 237 F.2d 129 (3d Cir. 1956), as follows:

> The essence of the Tax Court's alternative ground is that *property changes character merely by the fact of its being exposed for sale.* We agree with the taxpayer that such a concept is neither logical nor reasonable. [Emphasis supplied.] [*Id.* at 133.]

In the instant case, the machines were acquired and held for 16.6 years on the average and some of them for 30 years for the sole purpose of renting or leasing them. They were rental property and were not held primarily for sale in the ordinary course of the taxpayer's business. In fact, as stated above, they were not held for sale at all and no sales were made. The decree could not change the character of these machines overnight by requiring that they be sold to the lessees. Furthermore, the decree

ordered them sold in a most extraordinary manner that was not in the normal course of business of the taxpayer.

For all of these reasons and in accordance with the foregoing authorities, I would hold that as a matter of law plaintiff is entitled to recover and would enter judgment accordingly.

COLLINS, and NICHOLS, Judges join in the foregoing dissenting opinion.